**SOUTHERN PACIFIC COMPANY et al., Appellants,**

v.

**Velma Eloise STANLEY, Appellee.**

**No. 516.**

Court of Civil Appeals of Texas, Corpus Christi.

Sept. 24, 1970.

Rehearing Denied Nov. 12, 1970.

Anderson, Smith & Null, Joseph P. Kelley, Victoria, for appellants.

Kilgore, Cole & Garrett, Emmett Cole, Jr., Victoria, for appellee.

OPINION

GREEN, Chief Justice.

On this appeal the appellants are Southern Pacific Company and its engineer E. R. Weitzel. Appellee is Velma Eloise Stanley, widow of Ernest Stanley, deceased.

This is a companion case to Opal Gentry v. Southern Pacific Company (Tex.Civ.App. Corpus Christi 1969), 449 S.W.2d 527, aff'd Tex.Sup.Ct. July 15, 1970, 457 S.W.2d 889. It involves the same collision between one of Southern Pacific's trains being operated by E. R. Weitzel as engineer and J. J. Forman as acting fireman, and an automobile being driven by James G. Gentry and occupied also by Ernest Stanley. Gentry and Stanley were killed in the accident. Their widows filed separate suits to recover damages from the railroad company and Weitzel. The suits were tried jointly in one trial. The sole basis of liability sought to be imposed in *Gentry* on appeal was discovered peril, since Gentry, the driver of the car, was found guilty of several acts of contributory negligence proximately causing the collision. In view of the holding of the appellate courts in *Gentry*, supra, that there was *no evidence* to support the submission of discovered peril, such ground of liability is out of the case.

However, the jury did not find any negligence of the passenger Stanley, and no contention is made by appellants that any legal relationship existed between Stanley and Gentry which would cause Stanley to be chargeable with Gentry's negligence. The jury did find the railroad engine crew guilty of negligence proximately causing the accident in two respects, as follows:

"SPECIAL ISSUE NO. 4—Do you find from a preponderance of the evidence that the failure of J. J. Foreman to apply the emergency brake on the Defendant's train was negligence?

Answer 'Yes' or 'No'

We, the Jury, answer 'Yes'

SPECIAL ISSUE NO. 5—Do you find from a preponderance of the evidence that such negligence, if any you have found, was a proximate cause of the collision in question?

Answer 'Yes' or 'No'

We, the Jury, answer 'Yes'

SPECIAL ISSUE NO. 6—Do you find from a preponderance of the evidence that E. R. Weitzel failed to reduce the speed on the train which he was operating at the time when a person of ordinary prudence in the exercise of ordinary care would have reduced the speed of said train?

Answer 'Yes' or 'No'

We, the Jury, answer 'Yes'

SPECIAL ISSUE NO. 7—Do you find from a preponderance of the evidence that such failure, if any, was a proximate cause of the collision in question?

Answer 'Yes' or 'No'

We, the Jury, answer 'Yes' "

Based on such jury findings, and the answer to the damage issue, the trial court rendered judgment for appellee Mrs. Stanley and against appellants railroad and its engineer Weitzel for the sum of $55,989.22, which was later reduced on the filing of a remittitur by appellee to $54,972.69. Appellants' motion for judgment n. o. v. as to plaintiff Stanley, and their subsequent amended motion for new trial were overruled, and they have appealed to this Court.

By a number of points of error (Nos. 1, 3, 6, 8, 10, 26, 27) appellants assert that there was *no evidence* of any negligence or proximate cause on the part of defendants on this occasion, and particularly *no evidence* to support the submission of special issues Nos. 4, 5, 6 and 7, and they argue under such points that the court erred in overruling their objections to the sub-

mission of such special issues, and in rendering judgment based on the jury's affirmative answers.

Prior to submission of the case to the jury appellants duly objected to the giving of the foregoing special issues on the ground, among others, that there was no evidence to support their submission. The same objections were raised in their Motion for Instructed Verdict, Motion for Judgment, and Amended Motion for New Trial. The trial court overruled the objections in each instance.

The evidence of the events leading to the occurrence in question is thoroughly summarized in the opinions of the Supreme Court and of this Court in *Gentry*, supra. We copy from the Supreme Court opinion the following:

"We will review the evidence and the inferences therefrom in the light most favorable to plaintiff and in support of the jury's answer. Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951); and cases hereinafter cited.

The accident occurred near the small community of El Toro, Texas, on March 6, 1965, at approximately 3:45 p. m. The weather was clear. The automobile was traveling in a northerly direction on Farm to Market Road 234, with the train traveling in a westerly direction at approximately right angles. As the automobile approached the crossing there were five warnings: (1) a round sign on the shoulder of the road bearing an X with the letter R on each side of the sign; (2) an X, with an R on each side, painted on the surface of the portion of the road being traveled by the deceased driver; (3) cross arms with two flashing red lights; (4) the engine's horn or whistle; and (5) the engine's bell. The undisputed evidence shows that the audible and visual warning devices were functioning properly on the occasion.

The engineer, Mr. Weitzel, testified in substance as follows: the compartment from which the train is operated by the engineer is located in the first engine or unit. The particular unit involved in the accident is a 1500 horsepower diesel electric locomotive. The entire train consisted of four units, a caboose, and one hundred and fourteen cars, seventy-four of which were loaded and forty empty. The engineer occupies the right side of the unit and the fireman is located on the left. The primary duty of the fireman is to maintain a constant lookout for obstructions on the tracks to the left-front of the train, and to alert the engineer of traffic that is approaching the railroad-highway crossings from his side. Traveling at a speed estimated to have been 39 or 40 miles per hour, the lead unit approached the whistle board located one-fourth of a mile east of the intersection. A whistle board is a railroad marker designed to inform the engineer of an upcoming crossing, and alerts the engineer to the necessity for blowing the air horn as a warning to approaching traffic. At that time Weitzel commenced blowing the air horn. When the unit was approximately 1,000 feet east of the crossing the fireman, Forman, said that 'he saw an automobile.' Weitzel continued to blow the air horn, and he also turned on the bell ringer. He did nothing else, because as far as he knew, that was all there was to do. He looked to the left but could not see the car, possibly because 'there were trees that might have been in the way.' Although such size trains as this one do not 'stop on a dime,' he never had reduced the speed of any train in an effort to avoid a collision. Weitzel did nothing to prepare to stop or slow the train other than to place his hand on the emergency brake without applying it. He knew that the only manner is which he could avoid a collision with a car on the track at the crossing should one be there, was by reducing the speed of the engine, because he could not take any evasive action on a train track.

The speed of the train could have been reduced somewhat before reaching the crossing, if he had applied the brake when the fireman had first alerted him of the oncoming automobile, which was at a point 1,000 feet from the intersection. He knew that once he passed a point three or four hundred feet from the crossing, he could do nothing effective to stop or slow the train in time to avoid a collision. At a distance of about 100 feet east of the intersection the fireman called out, 'They are going to hit us, stop,' and then 'put the brakes into emergency on the unit.' It was too late. The lead unit, even with the emergency brake on, traveled over two thousand feet beyond the point of impact, pushing the automobile along in front of it. In conclusion, Weitzel stated that he never did see the automobile, but rather, that he relied on the fireman to give him any information of any car approaching from the left side of the train.

The fireman, Forman, testified: that he was actually a brakeman, but that he was serving as fireman on March 6, 1965. He knew that he must maintain lookout for any obstructions forward and to the left of the diesel locomotive, and to alert the engineer of the traffic approaching an intersection from his side of the train. He first noticed the Gentry automobile when the lead unit was about 1,000 feet from the crossing, the vehicle then appearing to be about 2,000 feet or a little better from the intersection. Forman estimated the speed of the train to be approximately 37 or 38 miles per hour, and that of the automobile to be about 60 or 65 miles per hour. This was just after the train had passed the whistle board, so the engineer had already begun to blow the air horn. At this point in time he turned to the engineer and said, 'We got a car coming up on my side pretty fast.' After the engineer blew the whistle again, Forman told him, 'blow your whistle for all it has got.' From that point, for approximately 700 feet,

viz, until the train was about 300 feet east of the crossing, the fireman watched the vehicle in its approach to the intersection, observing all the while that the car did not appear to be reducing its speed. At 300 feet from the crossing, due to the brush, he lost sight of the automobile. At that time the auto was about 500 or 600 feet from the crossing. When the train reached the area immediately beyond this brush, the automobile again came into view. Forman testified 'until we got right at the crossing I seen he could not stop, so that's when I told the engineer to stop.' But the locomotive was a mere 100 feet from the crossing, and application of the emergency brake at this point was too late."

We copy from the Court of Civil Appeals' opinion in *Gentry,* 449 S.W.2d 527, on p. 530, as follows:

"Henry W. Dillard, called as a witness for plaintiffs, testified among other things substantially as follows:

For twenty years, he had been an engineer and fireman for the Missouri Pacific Railroad Company, and was familiar with the operation of railroad diesel engines such as the one in question. He was also familiar with the customs and general practices of operators of them. The practice in the industry was that when a fireman on a train operating at the speed of this train according to the testimony of the fireman and engineer approached an intersection regulated by flashing lights, and when about one thousand feet from the crossing saw a car about two thousand feet from the intersection on a farm to market road speeding toward the intersection at between sixty and sixty-five m. p. h. and giving no indication of slowing down or stopping, the fireman should warn the engineer and the engineer should try to avert the accident by applying his brakes and changing the speed of the train. In this connection, there was evidence that at any time prior

to the view of the fireman being obstructed by the trees and brush, the brakes could have been so manipulated, consistent with safety, as to slow the train sufficiently to avoid the collision."

Highway patrolman Hewitt testified that it would take about 150 feet to stop a car at 60 m. p. h. after the brakes were applied. There was no contrary evidence. It was stipulated by the parties that the average reaction time from seeing the danger to hitting the brakes is about ¾ of a second. A car at the speed of 60 m. p. h. travels 88 feet in a second. Thus, the car traveling at the speed it was going, according to all the undisputed evidence, during the time that the fireman observed it could and should have been stopped in a distance of approximately 200–230 feet.

It is well settled that a person is not bound to anticipate negligence or unlawful conduct on the part of another. Texas & N.O.R. Co. v. Brannen, Tex.Com.App., 140 Tex. 52, 166 S.W.2d 112, op. adopted; De-Winne v. Allen, 154 Tex. 316, 277 S.W.2d 95; Texas & New Orleans Ry. Co. v. Hart, 163 Tex. 450, 356 S.W.2d 901; Gentry, Tex.Sup.Ct., supra.

■ Under the circumstances as they existed at the time, the engine crew were entitled to assume, until it reasonably appeared to the contrary, that the driver of the car would heed the visible and audible signals, and stop before driving onto the tracks. Art. 6701d Sec. 86, Vernon's Ann. Texas Civ.St.; Gentry, Sup.Ct. opinion, supra. The engine crew was not required to anticipate that the driver of the car would ignore three visual warnings: (1) the round sign on the shoulder of the road bearing an X with the letter R on each side of the sign; (2) an X with an R on each side, painted on the surface of the portion of the road on which the car was proceeding; (3) cross arms, with two flashing red lights, and two audible warnings (the engine's horn or whistle and the engine's bell) in heedless disregard of the safety of the car and those in it, and not stop.

It is argued that the engineer should have been put on notice of danger ahead when the fireman stated to him as the engine was about 1000 or so feet from the crossing: "We got a car coming up on my side pretty fast. Blow your whistle for all it has got." According to the undisputed evidence, and as found by the Supreme Court in Gentry, the engineer was blowing the whistle (or horn) of the engine, as well as ringing the engine's bell, at the time the fireman notified him of the car, and at that time the car was, according to the undisputed evidence, approximately 2000 feet or thereabouts from the crossing and the engine 1000 feet away. Also, the red flashing lights and audible signals were functioning properly. We perceive no duty on the part of either member of the engine crew to take any action toward slowing the train at that time.

We find no evidence which placed any duty on the engineer or fireman to slow or attempt to stop the train prior to the time that the train went behind the brush, and the car was no longer visible. At that time, under the undisputed evidence, the train was approximately 300 feet from the crossing. There was still more than sufficient distance for the car to stop in obedience to the warning signs in operation. In particular, there was no evidence and no finding that the train was being operated at an excessive rate of speed under the circumstances. Compare Biggers v. Continental Bus System, Inc., 157 Tex. 351, 303 S.W.2d 359. We find no evidence which would put the engine crew on notice that the car might not heed the warning signals, i. e., might proceed on to the tracks without stopping, during the time the train travelled the 200 feet behind the brush. *Nor is there any probative evidence that at the distance of 300 feet or just prior to losing sight of the car due to the brush, the crew could have done anything which would slow the speed of the train prior to reaching the crossing.*

In connection with reduction of speed or stopping of the train, the Supreme Court in *Gentry* has stated as follows:

" \* \* \* It is undisputed that the train could not have been brought to a stop within 1000 feet and the plaintiff does not so contend in this Court. Plaintiff contends that 'at all times up until the train was 300 feet from the intersection (which also was the point at which the automobile passed from the fireman's view behind some brush) it could have slowed sufficiently to have avoided the collision.' There is no evidence concerning the amount of reduction of speed, if any, of the train upon application of emergency brakes of the train at any point within 1000 feet of the intersection."

It thus appears that the crucial point in time in connection with the issues of liability found against the members of the engine crew was when the car again came into view of the fireman after the brush line had been passed. It was at that point, as we view the evidence, that a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances as were Weitzel and Forman would have been first put on notice that the driver of the car might, in violation of the law, fail to stop before reaching the crossing. However, again it was too late for the engine crew to do anything effective to reduce the train's speed.

The omissions found by the jury on the part of the fireman (failure to apply the emergency brake) and on the part of the engineer (failure to reduce speed, etc.) can not fix liability against the Railroad, because prior to the above-mentioned point in time there was no probative evidence of

negligence on the part of the railroad employees in the respects inquired of in issues 4, 5, 6, and 7, and there was no duty on their part up to that point to take evasive action. The evidence concerning the conduct of the train crew after the car came from behind the brush into the view of the fireman is that he immediately shouted to the engineer to stop and the engineer immediately applied the emergency brakes. At that time the testimony is that the engineer already had his hand on the brake valve and was ready to use it if necessary, but that the fireman would have had to reach for the emergency brake valve on his side of the train. There was no evidence to the contrary.

Under all the conditions and circumstances shown in the record, it appears that there is no evidence to support the jury answers to special issues numbers 4, 5, 6 and 7, and we sustain appellants' no evidence points directed at the submission of such special issues.

It becomes unnecessary that we decide appellants' remaining points of error, including their points raising factual insufficiency of the evidence to support the jury's answers to Special Issues Nos. 4, 5, 6, and 7. We do not pass upon these points.

The only jury findings on liability authorizing the entry of the judgment for appellee were the answers to Special Issues 4, 5, 6, and 7. There being no evidence to support the submission of such issues, and no evidence to support the jury's answers thereto, the proper judgment to have been entered would have been a take-nothing judgment. We accordingly reverse the judgment for appellee, and render judgment that plaintiff-appellee take nothing from defendants-appellants.

Reversed and rendered.