**SOUTHERN PACIFIC COMPANY et al., Appellants,**

v.

**Velma Eloise STANLEY, Appellee.**

**No. 516.**

Court of Civil Appeals of Texas, Corpus Christi.

Oct. 28, 1971.

Opinion on Remittitur Nov. 4, 1971.

Rehearing Denied Nov. 24, 1971.

---

54

Anderson, Smith & Null, Joseph P. Kelly, Victoria, for appellants.

Kilgore, Cole & Garrett, W. W. Kilgore, Victoria, for appellee.

## OPINION

NYE, Chief Justice.

This is an automobile-train intersectional collision case. Velma Eloise Stanley brought suit against the Southern Pacific Railroad Company and the engineer for damages on account of the wrongful death of her husband Ernest Stanley. Prior to trial, this case was consolidated with another action pending in the same court by Opal Gentry against the same defendants. Her husband, James Gentry, was the driver of the vehicle that was hit by the defendants' train. The collision killed both men, the passenger Ernest Stanley, deceased husband of plaintiff, and James Gentry. The companion case involving Opal Gentry was finally determined in this Court and in the Supreme Court and is therefore not a part of this appeal, except to the extent that the facts are relevant because they arose out of the same occurrence.[1, 2]

The trial court entered judgment, based on the jury verdict, against the defendants and in favor of the plaintiff Stanley. On appeal this Court did, on September 24, 1970, reverse the trial court's judgment and render judgment in favor of the defendants. This action was based on our holding that there was no evidence to support the primary issues of negligence found against the defendants.[3] For this reason it was unnecessary to decide the railroad's remaining points of error, including their points of factual insufficiency of the evidence. The Supreme Court found, however, that there was evidence of primary negligence and proximate cause of the engineer and therefore reversed this Court and remanded it to us for a consideration of the points not heretofore determined.[4]

The appellants by their first and second points of error contend that they are entitled to a new trial because the findings

of the jury in response to special issues 6 and 7 were contrary to and were against the great weight and preponderance of the evidence to such an extent that the findings of the jury were clearly wrong. The primary negligence issues found by the jury and involved in this appeal are as follows:

"SPECIAL ISSUE NO. 6—Do you find from a preponderance of the evidence that E. R. Weitzel (the engineer) failed to reduce the speed on the train which he was operating at the time when a person of ordinary prudence in the exercise of ordinary care would have reduced the speed of said train?

Answer 'Yes' or 'No'.

We, the Jury, answer 'Yes'.

If you have answered Special Issue No. 6 'Yes' and only in such event, then answer:

SPECIAL ISSUE NO. 7—Do you find from a preponderance of the evidence that such failure, if any, was a proximate cause of the collision in question?

Answer 'Yes' or 'No'.

We, the Jury, answer 'Yes'."

This Court and the Supreme Court in the four prior opinions of this case (see citations in footnotes 1 through 4) have fairly covered nearly all the facts in this case. It is therefore unnecessary for us to elaborate extensively concerning the facts involved. We do analyze portions of the evidence in as brief and as general a way possible, to point out the basis for the jury verdict.

The evidence question requires the Court of Civil Appeals in the exercise of its power to consider and weigh all of the evidence in the case and to set aside the

1. Gentry v. Southern Pacific Company, 449 S.W.2d 527 (Tex.Civ.App.—Corpus Christi 1969).

2. Gentry v. Southern Pacific Company, 457 S.W.2d 889 (Tex.Sup.1970).

3. Southern Pacific Company v. Stanley, 459 S.W.2d 232 (Tex.Civ.App.—Corpus Christi 1970).

4. Stanley v. Southern Pacific Company, 466 S.W.2d 548 (Tex.Sup.1971).

verdict and remand the cause for a new trial if we conclude that the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. We are required to consider all the evidence of probative force tending to prove the existence of the vital facts and the evidence tending to disprove their existence. If the findings by the jury of the existence of the facts (considering all of the evidence) is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust, this Court should sustain the point or points of error, reverse the judgment, and order a new trial. Otherwise, this Court should overrule the points and affirm. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951), and "No Evidence and Insufficient Evidence Points of Error" by Robert W. Calvert, 38 Tex.Law Review 359.

The jury acquitted Stanley of contributory negligence. There is no contention here that the contributory negligence of the driver Gentry was imputed to his passenger Stanley. The negligence problem here is whether the engineer under all the circumstances acted as a person of ordinary prudence. It is not limited to what the engineer actually knew and realized. It encompasses what a person of ordinary prudence should know and realize.

E. R. Weitzel, the engineer, testified that prior to the time of the collision, he was riding on the right hand seat of the engine away from the approaching car. J. J. Forman, the fireman, was on the left hand seat nearest to the car occupied by the plaintiff. The engineer testified that when he had reached a point of approximately one thousand feet from the crossing, Forman told him "there will be a car coming". The speed of the train was 30 to 40 miles an hour. The engineer started blowing the horn on the train and ringing the bell about a quarter of a mile from the crossing. He testified that he continued to blow the horn as loud as he could until the collision. The bell was still ringing after the train stopped.

The engineer testified that at approximately one hundred feet from the crossing the fireman cried out "They are going to hit us, stop!" He immediately put the brakes on emergency. He said that when the fireman first spoke up it meant to him to be on the alert and that he expected to be warned again if it looked like a collision might occur. As a result of the first warning he placed his hand on the brake valve but did nothing until he was about one hundred feet from the crossing. Forman stated that he did not realize the car would not stop when he first told the engineer about it, but wanted to alert the engineer. He stated that he did not realize the emergency of the situation until the car emerged from the brush, at which time he told the engineer to stop.

In our previous opinion we decided that there was no duty on the part of either member of the engine crew to take any action towards slowing the train prior to the time that the train went behind the brush, and the car was no longer visible. The Supreme Court reversed the Court of Civil Appeals, saying:

" * * * the duty arose when the operators should have realized that the automobile was 'pursuing a course which will probably terminate in serious body injury. * * *' We therefore do not agree with the holding of the court of civil appeals in this case that no duty arose until the car emerged from behind the brush, at which time the crew knew that a collision could not be avoided."

We therefore reconsider all of the relevant evidence that would point to the time when the duty of the engineer arose.

The evidence was undisputed that the signals were flashing, the train had the right-of-way and that the car was required to stop. It is true that the engine crew had the right to assume that the automobile would stop. They were not required to anticipate negligent conduct. But the

Supreme Court, speaking about this very situation, said:

"Even if the driver of a train or an automobile has the right-of-way, he nevertheless must exercise ordinary care. While he is not ordinarily required to anticipate the negligent conduct of others, a duty does arise when he anticipates, or should anticipate, that the other person's conduct is about to bring about a dangerous situation. The person having the right-of-way cannot exercise it with impunity. * * *

A recognized text explores the proposition that a person may assume that others will act lawfully and carefully. It states that, 'Rightfully understood this is sound enough. * * *' But there are exceptions. One of them is 'where the facts in a specific case would show to a reasonable man in the actor's position that another person will probably disobey the law this time.' 2 Harper & James, The Law of Torts (1956) 942."

The Highway Patrolman Hewitt stated that the train travelled 2,097 feet past the crossing. The Patrolman stated that the exhibit showed that the skid marks of the car indicated that the brakes were applied, then released, before it reached the tracks. He estimated the speed of the car to be 50 to 60 miles per hour and that at that speed it would take the car about 150 feet to stop after the driver had hit the brakes.

The photographs in this case show, that had the vehicle in which the plaintiff's husband had been riding, gone another 15 feet, the automobile would have cleared the tracks and the collision would not have occurred. By simple mathematical computation the jury could have reasonably concluded that an automobile going 60 miles per hour travels 88 feet per second. At that speed it only takes about $\frac{1}{6}$th of a second to travel 15 feet. Assuming that the car was going half that speed or less as the jury might reasonably conclude from the evidence, it still would only have taken a third to a half of a second to have cleared the crossing. The Supreme Court said:

"The cause-in-fact element of proximate cause is close; i. e., whether the collision would have been averted if the brakes had been applied and the throttle adjusted at or after 1,000 feet from the crossing. As was observed in the Ford case, supra, a delay of even a few seconds might have averted the collision. There was evidence that action on the part of the engineer at 1,000 feet would have slowed the train. And there was the testimony from Dillard as to reduction in speed of a few miles per hour by the service application of the brakes. We regard this testimony and the reasonable inferences therefrom to be sufficient to raise the issue for the jury."

If this and other evidence shows that the engineer could have slowed the train sufficiently, the vehicle would have cleared the crossing.

The Supreme Court in summarizing most of the evidence and the circumstances of this case was also of the opinion that:

" * * * there was some evidence that the engineer failed to exercise ordinary care. He was warned at 1,000 feet that a car was approaching the crossing. The speed of the car was 60 to 65 miles per hour, and it gave no indication that it was reducing speed. The fireman testified that he warned the engineer only of cars which constituted a hazard. (*The fireman's version of what he told the engineer was different from what the engineer said. The fireman said: "We got a car coming up on my side pretty fast —Blow your whistle for all it has got.")* The engineer was conscious enough of the possibility of a collision to put his hand on the brake. He did not put it into the lap position which, under Dillard's testimony, would have prepared the train for the application of the brakes and could have saved 3 or 4 seconds. He did not put the brake into the service position which, under Dillard's testimony, would

have slowed the train 'a mile or two an hour.' The engineer himself conceded that if he had eased off on the throttle and reduced the air on the brakes at 1,000 feet it would have slowed the train (by the time it got to the crossing.) The jury was entitled to believe the testimony of Dillard that it was the custom and practice, under similar circumstances, for the engineer to have attempted to avert an accident by applying the brakes and reducing the speed of the train." Stanley v. Southern Pacific Company, 466 S.W.2d 548 at 553. (Comment and emphasis supplied.)

The expert witness Dillard in his opinion testified as to what the practice in industry would require the engineer to do in a situation similar to that which was confronted by engineer Weitzel. His answer was, "To try to avert an accident."—"By applying his brakes and changing the speed of the train". Q "By doing what?" A "By braking or throttling off or something."

The testimony was that the engineer's brake valve had four settings, lap, holding, service and emergency. The engineer testified that in all of his years of experience as an engineer he never did slow his train to avert a pending collision. He didn't recall ever having had a close call, but he never had reduced the speed of a train because he saw a car coming toward it as an effort to avoid it. He was asked the question: "But other than seeing a car on the tracks you have never reduced the speed of your train in an effort to avoid a collision?" A "No, sir. I don't believe in out guessing the people in behind the wheel of an automobile."

The engineer Weitzel did not use any of the four brake settings until he applied the emergency setting when the train was about a hundred feet from the crossing, and the collision was imminent. The expert witness Dillard testified that if the brake had been put into "lap" position, it would have equalized the air pressure in all the brake valves on all of the cars of the train—the effect would have been to stretch the train out. Had the lap position been used, it would have shortened the time it would have taken for the brakes to take effect by three or four seconds. He was then asked "What in your opinion is the practice of the engineer in operating a train under these circumstances where the person sitting in the fireman's seat would say at the time when you are about 1000 feet from the intersection, 'You have a car coming fast on this side.'?" The witness: "I would begin to stop."

The facts were undisputed that the engineer did not reduce the throttle of the train or make any other effort to slow the train until he was about 100 feet from the intersection. At the speed the train was travelling, it only took the train about 2 or 3 seconds to travel that last 100 feet.

The engineer testified concerning the descending and ascending grade of the tracks prior to the crossing in question:

"Q As you head out of Edna did you have any descending grade?

A You have more or less a level grade until you get to the Lavaca River and then you have a descending grade, yes, sir.

Q After you cross the river bottom heading on south what happens to the grade then of the tracks?

A You still have a descending grade there. You have the river and then the river is wide. You are still going down. There is another bridge in there, one is the river bridge and another is a bridge made of, you don't have the overhead span on it.

Q You have a second bridge over something in the river bottom?

A Yes, sir.

Q Then as you head on to the El Toro crossing (where the collision took place) then what happens to the grade?

A Then you begin to come up hill out of the river bottom.

Q And as you get to the El Toro crossing what is the grade like?

A The grade more or less levels off there.

Q I believe you testified to this but just to make it clear to the jury, as you approached the El Toro crossing was any of your train still on the descending grade?

A I presume it would be. To the best of my knowledge I would say there was a good little bit of it on descending grade.

Q The back end of your train was still down in the river bottom?

A Yes, sir."

The foreman, J. J. Forman, testified concerning the slowing of the train as follows:

"Q * * * Let's assume the train you had that day with 114 cars and you released six or eight pounds the way my notes reflect, it slows the train a little and gets it ready to stop but does not affect its running; is that a true statement?

A It will slow your train down. It gets your train stretched out in a position where you are not apt to break it in two.

Q But it does slow the train a little bit?

A Very little.

Q Can you give us any approximation how much it would slow it going thirty-seven miles an hour?

A It depends on how long you leave it on. If you leave that air at six or ten pounds reduction it is going to finally stop.

Q Let's assume we left it on for one thousand feet?

A That depends on whether or not you are going upgrade, downgrade or on level track.

Q Let's assume the very situation we had the date of the collision.

A Well, it might slow it down practically to a stop at one thousand feet.

Q To a stop?

A (nods head affirmatively)"

The witness later attempted to qualify this statement, but still stated that the train would have slowed.

■ Having considered all of the (direct and circumstantial) evidence that preponderates for and against the findings of the jury to special issues number 6 and 7, and giving effect to the reasonable inferences that the jury was permitted to make for such evidence, we hold that the jury's findings are not contrary to the great weight and preponderance of the evidence. Appellants' points one and two are overruled.

■ The appellants next contend that the trial court erred in permitting plaintiff's counsel to ask certain questions of the jury during voir dire examination which they contend were calculated to commit the jurors to finding the defendant railroad negligent. The general rule is that on voir dire examination of the jury, counsel is allowed considerable latitude in its examination. The nature of the examination is addressed to the sound discretion of the trial court. Its action thereon will not be disturbed unless it appears that there has been a clear abuse of such discretion. We have carefully reviewed all of the voir dire examination complained of and the rulings by the trial court. We do not construe the questions asked of the jury as a commitment in advance. It is our opinion that the discretion of the trial court was not abused. Travelers Insurance Company v. Beisel, 382 S.W.2d 515 (Tex.Civ.App.

—Amarillo 1964); Levermann v. Cartall, 393 S.W.2d 931 (Tex.Civ.App.—San Antonio 1965).

Appellants' points five through eight complain of the submission of certain special issues. One of the issues submitted to the jury inquired whether or not the engineer was negligent in his brake application and another whether or not he was negligent in failing to reduce the speed of the train. The defendants contend that the trial court erred in permitting the issues, one general and one specific. Such submission allowed plaintiff "two bites at the same apple," they contend, citing: Barclay v. C. C. Pitts Sand and Gravel Company, 387 S.W.2d 644 (Tex.Sup.1965). This case is not in point. The issue concerning brakes was not a different shade of the issue concerning reduction of speed. The engineer had several brake positions: the service application for the standard stopping of the train, and the emergency position used as the name implies. In addition to this, he had a lap position which conditioned the brakes for stopping. The lap position had the effect of slowing the train, if used. The reducing of the speed of the train could be accomplished by closing the throttle as well as by placing the brakes in the lap position without resort to the emergency or service use. Actually the proper use of the brakes is not before us on this consideration of the appeal, as that issue became moot as a result of the Supreme Court's ruling. In any event, we do not find that the issues were improperly submitted as a global and specific issue. This was not a double submission of the same issue or shades of the same issue. Dallas Railway & Terminal Co. v. Clayton, 274 S.W.2d 422 (Tex.Civ.App.—Dallas 1954, n. r. e.); Connor v. Heard & Heard, Inc., 242 S.W.2d 205 (Tex.Civ.App.—San Antonio 1955, n. r. e.). Appellants' points are overruled.

Appellants contend in points nine, ten and eleven that this case should be reversed because there was no evidence or insufficient evidence of any reasonable basis on which to determine the plaintiff's life expectancy and because the award by the jury of the sum of $54,972.69 in damages is manifestly excessive under the evidence in the case. The uncontradicted evidence shows that the deceased Ernest Stanley had a life expectancy of 14.14 years. He was 63 years of age at the time of his death. He was in good health, was a good husband and provider for his family. The testimony indicates that Mr. Stanley would have continued to work for three additional years earning a salary in excess of $6,000.00 per year. The evidence was further apparent that upon his retirement he would have received $350.00 per month in retirement benefits. The plaintiff testified that Mr. Stanley intended to work after his retirement and that he would have been permitted to earn $1680.00 per year and still draw his full retirement. From the testimony in the record it is shown that his continued employment for three years would have given Mr. Stanley at least $18,000.00. His retirement benefits for eleven years would have produced in excess of $46,000.00. Additional income of $1600.00 plus per year would have produced a total income far in excess of $80,000.00.

Damages need not be proved directly. They may be shown by circumstances from other evidence introduced in the record. The evidence must however be sufficient to furnish the jury a basis for estimating the damages sustained by the wrongful death. Mrs. Stanley was 56 years of age at the time of trial which was approximately three years after the death of her husband. She testified that she had been married to her husband for thirty-four years. They had lived for almost seventeen years in Edna, Texas. She testified that her husband had been employed by Mobil for over twenty years at the time of his death. She stated that she was entirely dependent upon her husband for support; that he purchased their home, their automobile and had kept up the home, lawn and did the repair work around the place. The jury had an opportunity to observe her and

evaluate her present physical condition as she testified. Although life tables are never taken as fixing the expectation of life of any particular person, they form a basis for calculation to be considered by the jury in connection with other pertinent evidence in ascertaining the probable duration of a life in question. We hold that the damages under the evidence are not excessive and that from all of the evidence there was a reasonable basis by which the jury could determine the life expectancy of the plaintiff. These points are overruled.

■■■■■ Appellants' third point is that the trial court erred in admitting certain testimony of the witness J. J. Forman on cross-examination over the objections of the defendants. The objectionable testimony was to the effect that if the train had been slowed enough, the collision would have been avoided. Mr. Forman was the fireman on the train. He had been employed by the defendant for 25 years. He had the duty to keep a lookout in front of the train and to his side. He had at his command the emergency brake valve. No doubt he was an expert witness. A good deal of latitude is allowed in the cross-examination of a witness. Expert railroad men are permitted to express their views on questions relating to the operations of trains. See Missouri Pacific Railroad Co. v. Goodson, 345 S.W.2d 569 (Tex.Civ.App. —San Antonio 1961, n. r. e.). The trial court permitted this witness to testify as to the speed of the train, the speed of the car, the distance of the train from the crossing, the distance of the car from the crossing, and other speeds and distances up to near the point of collision. We believe that the question was proper under the circumstances involved. See the following cases with similar circumstances: McCray v. Galveston H. & S. A. Ry. Co., 89 Tex. 168, 34 S.W. 95 (1896); Gainesville, H. & W. Ry. Co. v. Lacy, 86 Tex. 244, 24 S.W. 269 (1893); Galveston, H. & S. A. Ry. Co. v. Sample, 145 S.W. 1057 (Tex.Civ.App.—San Antonio 1912, n. r. e.); Missouri, K. & T. Ry. Co. of Texas v. Williams, 56 Tex.Civ. App. 246, 120 S.W. 553 (1909, wr. ref.); International & G. N. R. Co. v. Villareal, 36 Tex.Civ.App. 532, 82 S.W. 1063 (1904); San Antonio & A. P. Ry. Co. v. Beam, 50 S.W. 411 (Tex.Civ.App.1899); Galloway v. San Antonio & G. Ry. Co., 78 S.W. 32 (Tex.Civ.App.1903); Galveston, H. & S. A. Ry. Co. v. Ford, 22 Tex.Civ.App. 131, 54 S.W. 37 (1899, wr. ref.). This point is overruled.

Appellants' twelfth point is that the trial court erred in entering a judgment against the defendants for the additional sum of $1016.53 for funeral expenses of Ernest Stanley because there was no special issue submitted to the jury on such funeral expenses. The record shows that at the conclusion of the evidence there was no request by the plaintiff for an issue to be submitted to the jury on funeral expenses, even though there was testimony as to the amount of such expenses. The jury found that the damages sustained were $54,972.69. Plaintiff moved for judgment for this amount plus an additional amount of $1016.-53 for funeral expenses. The trial court granted the motion and gave plaintiff judgment for $55,989.22.

On motion for new trial, the defendants produced an affidavit that the jury, in considering the damage issue took into consideration the funeral expenses as a part of the award of $54,972.69. The plaintiff then filed a remittitur, reducing the judgment by the amount of the funeral expenses. Defendants' complaint here is that the jury had no basis in which to consider funeral expenses at all, because there was no stipulation in the record as to the amount of the funeral expenses and no proof as to their reasonableness. Therefore, the defendants contend that the amount of the funeral expenses were included in the original award of damages and again in the judgment based on defendants' motion. In effect the court awarded judgment for funeral expenses twice, both of which were in error.

The remittitur by plaintiff at the trial court level did not account for the errone-

ous consideration by the jury and the court. Plaintiff-appellee answered such argument here that the error complained of by the appellant is harmless and immaterial. We do not view such error as such.

■ The judgment of the trial court is excessive by the amount of $1016.53. It is accordingly ordered that a remittitur of $1016.53 be filed by the plaintiff-appellee in this Court within ten days following the announcement of this decision, whereupon this Court will reform the judgment of the trial court by the amount of such remittitur and affirm the judgment in accordance therewith. Otherwise, if the remittitur is not made, the judgment is reversed and the cause is remanded for a new trial.

Appellants' thirteenth point of error complains of the cumulative effect of all the errors presented. We have carefully considered all of the points of error, reviewed all of the testimony and other than the error concerning the funeral expenses, no reversible error is presented. Rule 434, Texas Rules of Civil Procedure.

SHARPE, J., not participating.

## OPINION ON THE FILING OF REMITTITUR

This Court has suggested that appellee remit the amount of $1016.53 as set forth in this opinion. The appellee, through her attorney, has filed a remittitur in the amount suggested and authorized in the opinion of this Court.

Therefore, in accordance with the opinion and judgment of this Court heretofore announced, the judgment of the trial court is reformed to the extent of the amount hereby remitted by appellee so that the amount of judgment against the defendants is reduced to the sum of $53,956.16, together with interest on said $53,956.16 at the rate of six percent (6%) per annum from the 26th day of February 1969, the date of rendition and entry of the judgment of the trial court. The costs as assessed

in the judgment to and including the trial shall remain as charged in the judgment. The costs of appeal shall be assessed ¾ths to the appellants and ¼th to the appellee.

The judgment as herein reformed is hereby affirmed.

Motions for rehearing may be filed by either party within fifteen days after the date this order is announced.

SHARPE, J., not participating.