Johnnie MITCHELL et al., Appellants,

v.

Dale Ensly JONES, Appellee.

No. 1163.

Court of Civil Appeals of Texas, Corpus Christi.

March 17, 1977.

T. R. Bandy, Jr., North, White & Blackmon, Allen V. Davis, Davis & Hale, Corpus Christi, for appellants.

Bill Blackburn, Corpus Christi, for appellee.

## OPINION

BISSETT, Justice.

The original opinion handed down by this Court on February 24, 1977 and the Supplemental Opinion handed down by this Court on March 10, 1977 are withdrawn and this opinion is substituted therefor.

This is a suit for damages for false arrest. Dale Ensly Jones instituted suit against Johnnie Mitchell, sheriff of Nueces County, M. S. Burton and Troy Smith, deputy sheriffs of Nueces County at the time of the occurrence in question, and Western Surety Company, the surety on the sheriff's bond. He asked for $25,000.00 as damages for the "embarrassment, humiliation and mental suffering" which he allegedly suffered as a result of false arrest. Trial was to a jury, which awarded Jones $15,000.00. Judgment was rendered in that amount against defendants, Johnnie Mitchell, M. S. Burton and Troy Smith, jointly and severally; for $5,000.00 against Western Surety Company as a part of the $15,000.00 recovery; and judgment for Western Surety Company over and against Johnnie Mitchell for the recovery of any money paid by it to Jones. All of the defendants have appealed.

We first consider defendants' third and fourth points of error, wherein they say that the trial court erred in rendering judgment against them because: 1) "the verdict of the jury is against the great weight and preponderance of the evidence"; and 2) "the evidence is factually insufficient to support the verdict".

The arrest was made on October 4, 1973. Plaintiff was then nineteen years of age, was married, and was employed by Globe Department Store, in Corpus Christi, Texas.

The series of events from which this case developed began when a complaint of theft by bailee was made by the lessor named in a TV rental contract signed by "Dale Jones", the lessee. To the left of the lessee's signature in the contract appeared the writing "Dale Edward Jones 1318½ 6th St., Corpus Christi, Texas", followed by a driver's license number. The lessee had disappeared with the set and had discontinued payments.

An attorney in the District Attorney's office prepared a case sheet. The original complaint was sent to the Justice of the Peace. None of these papers contained a middle name or initial of the accused. Upon receipt of the complaint, the Justice of the Peace issued a warrant of arrest for "Dale Jones" with no address or other identifying information on it.

Sheriff Johnnie Mitchell's deputy, Earl I. Hornburg, received the warrant. After telephone inquiry of the District Attorney's office he recorded "no info" on the warrant. The next day Deputy Hornburg examined the District Attorney's file folder. He did not see the rental contract but wrote the 6th Street address on the warrant, which he found on an envelope in the file. He turned the warrant over for service by other officers as was the standard office procedure.

Deputy J. W. Talley tried to effect service at the 6th Street address and could neither find the accused nor his location. He returned the warrant for further processing.

The warrant was then given to Deputy Earl Rigby, who was assigned to locate people. He checked the telephone book, city directory, and finally obtained a Wal-

lace Street address for a "Dale Jones" from the local power utility. With "1820 Wallace" as the street address recorded on it, the warrant was reinserted into the service system.

The warrant was placed in the box of Deputy Burton for service. He went to the Wallace Street address with Deputy Smith but found no one there. Inquiries led Burton and Smith to the Globe Department Store.

Burton and Smith entered the Globe store at about 9:30 a. m., which was just prior to the opening of the store for business. They asked Mr. Edward Preusse, the security guard at the store, if "a Dale Jones" was working at the store. Preusse said: "yes"; whereupon they asked to see him. The plaintiff was paged over the loud-speaker system, and he came to the information desk in the store. Burton asked him if he was "Dale Jones"; he said "yes". Burton then told him that he had a warrant for his arrest. According to the plaintiff:

". . . it stunned me and I asked him what for and and he stated it was a felony theft charge so it was theft by bailee. . . ."

The plaintiff further testified that Burton told him:

". . . we had—have to go downtown to the courthouse and straighten it out."

The plaintiff did not know what the term "theft by bailee" meant, but he did know that a felony charge was serious. He then agreed to go to the courthouse with the deputies to straighten the matter out, but told them that he wanted to tell his supervisor that he had been arrested. Burton and Smith followed the plaintiff back to the middle of the store within arm's reach, and the plaintiff told his supervisor that he had been arrested and was going to have to go downtown. The plaintiff went out through the front of the store with the deputies right behind him. His fellow-employees were staring and "oohing and aahing". The plaintiff was patted down by the deputies before he got into the car at the front of the store, which action was also observed by several customers waiting to get into the store.

On the way to the courthouse, a six mile trip, discussions resumed. An explanation of the charge of theft by bailee did not satisfy the plaintiff. He was told by the deputies that he would have a chance to make one phone call. It was then that he realized for the first time that he was going to jail rather than to simply straighten matters out. He then began to think about jail conditions and about rumors that people in jail were sometimes sexually assaulted. The plaintiff was asked whether he had lived at the 6th Street address. When he said he had not, Burton suggested to Smith that he go by the District Attorney's office for more information. Smith did so, and Burton and the plaintiff proceeded to the jail. The plaintiff was taken through two locked and barred doors to the booking desk at the county jail. There all of his belongings, including his lunch which someone on duty told him he would not need because they fed prisoners at the jail, were taken from him. After a ten minute wait, he began giving his personal data to the officer. Before he had finished, Smith came in and advised the officer that they had the wrong man. This was confirmed within five minutes. The belongings of the plaintiff were returned to him. The three then left the jail. They arrived back at Globe approximately one hour after leaving the store.

The plaintiff testified that he was scared to death, and while waiting in the jail-holding area preceding his interrogation, he worried about the probability of losing his job. After being returned to the store, he said that he had the feeling that all of the other employees were watching him, and that it was about a week before they really believed that he was innocent of any wrongdoing. He further testified that two or three nights after the incident he had a nightmare about being stopped by Burton and Smith, and that "they were just tearing the car apart looking for something".

The plaintiff's wife testified that the experience upset him, and that he was affect-

ed by what had happened for a period of about three months. She further testified:

". . . he didn't sleep very good for a while after this happened . . . every time we'd be out in public and he'd see a sheriff's deputies car, well, he'd, you know, he'd start looking out in his rearview mirror and keeping an eye on them."

Preusse overheard the conversation between the deputies and the plaintiff. He said that the plaintiff "appeared shocked" and "turned pale". He noticed that several customers who were then outside the store observed "Dale being taken out there in his Globe Discount City jacket apparently under arrest by the sheriff's deputies".

Burton and Smith discovered that the plaintiff was not the man for whom the arrest warrant was issued within fifteen minutes from the time they reached the courthouse. Deputy Smith determined this from looking in the District Attorney's file and getting the driver's license from the contract signed by the real subject of the arrest warrant. This information could have been obtained by the deputies as easily before the arrest as afterwards. The contract signed by the proper subject of the arrest warrant also shows that his middle name was "Edward" rather than "Ensly" (the middle name of the plaintiff), and that he ("Dale Edward Jones") lived at 1318½ Sixth Street in Corpus Christi. The plaintiff had never lived at 1318½ Sixth Street. However, even after the plaintiff told Burton and Smith that he had never lived at 1318½ Sixth Street, they did not release him and check the matter out further; they proceeded to continue to detain him at the jail. The warrant also showed that the subject of it had lived at 1318½ Sixth Street.

"Dale Edward Jones" was arrested between 12:00 and 1:30 p. m. the same day on which the plaintiff was arrested. In the Sheriff's Department's own records there was a file set up on "Dale Edward Jones", with a photograph of him in it. Deputy Sheriff Ray Fernandez testified that it was clear from the picture that the plaintiff was not the same person as "Dale Edward Jones".

The Sheriff's Department file also reflected that on October 4, 1973, "Dale Edward Jones" was on probation with the Nueces County Probation Office. His Probation Officer could have gotten in contact with him at any time through his employer, but nobody with the Sheriff's Office ever contacted the Probation Officer about the matter. Burton agreed that if he had checked the District Attorney's files before he arrested the plaintiff rather than afterwards, and had found out that the middle name of the man for whom the arrest warrant was issued was "Edward" and that the middle name of the plaintiff was "Ensly", he would not have arrested the plaintiff.

■ We have read the record in its entirety. We have considered all of the evidence. The finding of the jury to the effect that the plaintiff sustained injuries because of past "mental anguish, humiliation and embarrassment" is supported by competent evidence of probative value, that is factually sufficient to sustain the finding; it is not against the great weight and preponderance of the evidence. Defendants' third and fourth points are overruled.

■ Next the defendants complain that the jury's award to the plaintiff of $15,000.00 actual damages is excessive. They argue in this respect that Burton and Smith reasonably believed that the plaintiff was the proper person named in the warrant, that the mistake on the part of the deputies was an honest mistake, and that "the plaintiff was under a minimum form of detention for less than a half hour, at the conclusion of which he was absolutely aware and conclusively assured of his exoneration". They further say that the plaintiff was never mistreated, was not "handcuffed" at the store, and was never fingerprinted or photographed at the jail. They particularly point out the fact that the arrest did not cause the plaintiff to lose his job with Globe.

After carefully reviewing all of the evidence, we are of the opinion that the award

of $15,000.00 for actual damages is excessive. It, therefore, becomes our duty to suggest a remittitur and the time within which it may be filed. Rule 440, Texas Rules of Civil Procedure; *Impson v. Structural Metals, Inc.*, 487 S.W.2d 694 (Tex.Sup. 1972).

Both the plaintiff and the defendants have cited a number of cases in support of their respective positions relating to the question of whether the award is excessive to the point that a remittitur should be ordered. In resolving the issue, we recognize the difficulties presented. See *K–Mart No. 4195 v. Judge*, 515 S.W.2d 148 (Tex.Civ. App.—Beaumont 1974, writ dism'd).

The law has not furnished us with any fixed standards by which to measure an award for damages which resulted from mental anguish, embarrassment and humiliation for false arrest. From our review of the record, we are of the opinion that the amount of damages awarded to the plaintiff is excessive in the amount of $10,500.00. It is accordingly ordered that a remittitur of $10,500.00 be filed by the plaintiff in this Court within ten days from the announcement of this decision, whereupon this Court will reform the judgment of the trial court by the amount of the remittitur; otherwise the judgment of the trial court will be reversed and the cause remanded for a new trial. Rule 440, T.R.C.P.; *Carter v. Texarkana Bus Company*, 156 Tex. 285, 295 S.W.2d 653 (1956); *Southern Pacific Company v. Stanley*, 473 S.W.2d 52 (Tex.Civ. App.—Corpus Christi 1971, writ ref'd n. r. e.).

The plaintiff, through his attorney, filed the remittitur as suggested by this Court in its original opinion. Therefore, the judgment of the trial court is reformed to the extent of the amount hereby remitted by plaintiff so that the amount of judgment against the appellants is reduced to the sum of $4,500.00, and it is further ordered that the appellant, Western Surety Company, have judgment over and against the defendant, Johnnie Mitchell for said amount of money.

The costs of this appeal are taxed 50% to the plaintiff and 50% to the defendants.

The judgment as herein reformed is hereby AFFIRMED. Motion for rehearing is OVERRULED.