Velma Eloise STANLEY, Petitioner,

v.

SOUTHERN PACIFIC COMPANY et al.,
Respondents.

No. B–2452.

Supreme Court of Texas.

April 21, 1971.

Rehearing Denied June 2, 1971.

Kilgore, Cole & Garrett, W. W. Kilgore and Emmett Cole, Jr., Victoria, Robert S. Pieratt, Houston, Thomas R. Bell, Edna, for petitioner.

Anderson, Smith & Null, Joseph P. Kelly and Conde N. Anderson, Victoria, for respondents.

GREENHILL, Justice.

This action arose out of an intersection collision between an automobile and a Southern Pacific train. Trial was to a jury; and based on certain jury findings, judgment was entered for the plaintiff. The main question here is whether there is evidence to support the answers of the jury to the findings upon which the judgment rests. The court of civil appeals, finding no evidence to support the jury's verdict,. reversed the judgment of the trial court and rendered judgment for the railroad. 459 S.W.2d 232. We find there is evidence to support the jury's verdict. Accordingly we reverse the judgment of the court of civil appeals and remand the cause to that court to pass upon other points including the sufficiency of the evidence.

This is a companion case to Gentry v. Southern Pacific Company, 457 S.W.2d 889 (Tex.1970). Two men, the driver and a passenger, were killed in the automobile which collided with the train. Two separate suits were filed. They were tried together, but separately appealed. The Gentry case involved the driver; and this suit involves the passenger, Stanley. The plaintiff is Velma Eloise Stanley, widow of Ernest Stanley, deceased.

The engineer and fireman of the railroad were found to have been negligent in certain respects as will be discussed below. The driver of the automobile, Gentry, was found to have been guilty of contributory negligence; but the jury found the discovered peril issues against the railroad. The trial court in Gentry, finding no evidence to support the discovered peril issues, disregarded those issues and entered judgment for the defendant railroad because of the contributory negligence of Gentry. That judgment was affirmed. 457 S.W.2d 889.

While this case involves the same collision, the same jury's verdict, and virtually the same record on appeal, the problems are different. There is no contention that the contributory negligence of the driver, Gentry, is attributable to his passenger, Stanley; and the jury acquitted Stanley of contributory negligence. The discovered peril issues in Gentry turned upon whether the operators of the train's engine, as individuals, actually discovered and realized the peril of the plaintiffs in time to have avoided the collision; and whether, after such discovery and realization, they failed .to exercise ordinary care. The issue there was actual discovery and realization by the individuals. The holding was that, as a matter of law, they did not discover and realize the peril of those in the automobile in time to have avoided the collision. Gentry v. Southern Pacific Co., supra; Texas & New Orleans Ry. Co. v. Hart, 163 Tex. 450, 356 S.W.2d 901 (1962).

The negligence problem here is different. It is whether the fireman or engineer, under

all the circumstances, acted as persons of ordinary prudence. It encompasses what a person of ordinary prudence *should* know and realize, and is not limited to what they actually did know and realize.

The critical jury findings, set out just below, are numbered as they appeared in the jury's charge; but they are rearranged for purposes of the opinion. Our problem is whether there is some evidence to support them.

As to the engineer, Weitzel, the jury found:

(6) He did fail "to reduce the speed on the train . . . at the time when a person of ordinary prudence in the exercise of ordinary care would have reduced the speed of said train;" and (7) this was a proximate cause.

As to the fireman, Forman, the jury found:

(4) His failure "to apply the emergency brake on the defendant's train" was negligence; and (5) a proximate cause.

▋ Much of the evidence about the collision is detailed in the *Gentry* opinion, 457 S.W.2d 889; but our duty at this stage is to consider only the evidence favorable to the jury's verdict. Biggers v. Continental Bus System, Inc., 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359 (1957).

The accident occurred in a rural area on a clear day. As will be discussed, the highway and the railroad tracks are almost at right angles to each other. There were some trees along the railroad's right of way; and there was some fairly thick brush which obscured the vision of the car from the train's engine from the time that the engine was 200 to 300 feet from the crossing until the engine was about 100 feet from the crossing. As will be developed, the emergency brake of the train was applied when the train came from behind the brush about 100 feet from the crossing.

The automobile was being driven in a northerly direction at a speed estimated to be between 60 and 65 miles per hour. There were signs to warn the driver of the crossing including flashing red lights. The train was approaching from the east at approximately 37 to 40 miles per hour. The train consisted of four power units, 114 freight cars, and a caboose.

The engineer of the train, Mr. Weitzel, sat on the right hand side of the engine, the side away from the approaching car. He controlled the throttle and the brakes ordinarily used. There were four possible settings of his brakes to control the rate of deceleration: lap, holding, service, and emergency.

The fireman, Mr. Forman, sat on the left hand side of the engine. His duty was to look ahead and to the left, from which direction the car approached, and to inform the engineer of approaching traffic. The fireman also had an emergency brake.

The fireman first discovered the automobile when it was 2,000 or more feet from the crossing, and at a time when the engine was about 1,000 feet from it. The fireman testified that at that point he told the engineer, "We got a car coming up on my side pretty fast. . . . Blow your whistle for all it has got." The engineer did sound his whistle or horn; and he placed his hand on the brake lever, but he did *not* apply it. The fireman testified that the engineer did not do anything else; i. e., nothing except sound the horn and bell.

The engineer's version was that when the train was about 1,000 feet from the crossing, the fireman told him, "There will be a car coming." The engineer testified that the fireman only notified him if a car constituted some hazard; and that if, at 1,000 feet, he (the engineer) had eased off on the throttle and "reduced the air on the brake," "it would have slowed it [the train] down."

Beginning at a point when the engine was about 1,000 feet from the crossing, and

the automobile was about 2,000 feet from it, the fireman continued to watch the automobile. There is an inconsistency in the testimony of the fireman as to how far the car was from the crossing when it disappeared from the fireman's view because of the brush. Our opinion in *Gentry* construes the fireman's testimony, as it related to the discovered peril issues, to be that the automobile was then about 500 or 600 feet from the crossing. Later in his testimony, he placed the car only 200 to 300 feet from the crossing when it disappeared behind the brush. He also testified that when the automobile went out of his sight, the train's engine was 200 to 300 feet from the crossing. "I would say about 300 feet." The fireman testified that the driver of the car had not reduced his speed up to that point. The engineer testified that when the engine got to within about 300 feet from the crossing, he could tell that "they weren't reducing their speed," which was estimated at 60 to 65 miles per hour.

As stated, when the train was about 300 feet, and the car was 200 to 600 feet from the intersection, the car went out of the sight of the fireman. When the fireman next saw the automobile, the train was about 100 feet from the crossing. "He was right up there pretty close to the crossing . . . and that was when I told the engineer to stop. . . ." He did not apply his emergency brake, but he called out to the engineer, "They are going to hit us, stop." and "put the brakes into emergency. . . ." The engineer then put the brakes into emergency. It was too late and the train ran into the car at the crossing, striking the car on the passenger's side, between the front tire and the right front door.

■ The plaintiff put on an expert witness, a Mr. Dillard, to testify as to custom in the industry. Dillard had been a fireman and engineer for the Missouri Pacific for 20 years; and, as set out below, he was asked about the custom among firemen and engineers under circumstances similar to those here. Several objections were made to his testimony; but the only objection preserved by the railroad (its point 16 in the court of civil appeals) was that it was error to admit the testimony because it was "to the effect of what he [Dillard] would have done under the circumstances." We construe the objection and the point to be that Dillard did not give testimony as to custom but only as to his personal experiences and opinion. The trial court did not so construe it; and as pointed out below, he limited, or attempted to limit, the testimony to custom. Some of this testimony is set out below, and it is capable of the interpretation that the witness was testifying about custom and not merely about personal opinion. In admitting such testimony, the trial judge is called upon to exercise his discretion. 2 Wigmore on Evidence (3rd ed) 316, § 379.

■ It is pointed out in 2 McCormick & Ray on Evidence (2nd ed) 376, § 1527, that the customary conduct of other persons generally in a similar situation or business is relevant and admissible. The first example is, "Thus a railroad company charged with negligence in the operation of a train, or the management of a switch, may show the practice or custom of other railroads as to such matters." We see no reason why the rule should not operate both ways; i. e., against the railroad· as well as for it. The text also states the rule to be that evidence as to such customs is not controlling and must not be taken as the legal standard of care and negligence, but is merely evidence to be considered along with other circumstances in determining what the ordinary reasonable man would do under the circumstances. We find no abuse of discretion and hold that Dillard's testimony is admissible in determining whether there is any evidence to support the jury's answers. Honea v. Coca Cola Bottling Co., 143 Tex. 272, 183 S.W.2d 968 (1944); Gulf, C. & S. F. Ry. Co. v. Harriett, 80 Tex. 73, 15 S.W. 556 (1891).

Mr. Dillard testified that the railroads do have a uniform code of operating rules, applicable to all railroads. He was asked:

"Based on your experience as a fireman and assuming you were riding on the fireman's left hand seat on a train operating down the line thirty-nine miles an hour approaching an intersection regulated by flashing lights, and that you saw a car about two thousand or twenty-five hundred feet from the intersection when you were one thousand feet from the intersection running between sixty and sixty-five miles an hour and giving no indication it was slowing up or stopping; assuming those facts, this was on a farm to market road you were crossing, assuming all of those facts and in your opinion what would the practice in the industry have required you to do at that time?"

Answer: "I would warn the engineer."[1]

He was then asked "And after that would the practice in the industry then require the engineer to do anything?" There was objection, and the question was rephrased: "What would the practice in the industry in your opinion require the engineer to do in that situation?" Answer: "To try to avert an accident . . . by applying his brakes and changing the speed of his train."

Question: "By doing what?"

Answer: "By braking or throttling off or something."

As set out above, the engineer's brake valve had four settings: lap, holding, service, and emergency. The engineer, Weitzel, used none of them until he applied the emergency when the train was only about 100 feet from the crossing. Dillard testified that if the brake had been put into the "lap" position, the effect would have been to equalize the air pressure in all the brake valves in all of the cars of the train; and if the lap position had been used, it would have shortened the time it would take to apply the brakes throughout all the cars of the train by 3 or 4 seconds. The "lap" position, he said, is used when the engineer is preparing to stop, and "you gain 3 or 4 seconds."

He further testified that the speed of a train with 114 cars could be reduced, without adversely affecting the train's operation, by the use of the "service" application of the brakes.

He was then asked:

"What in your opinion is the practice of the engineer in operating a train under these circumstances where the person sitting in the fireman's seat would say at the time when you are about one thousand feet from an intersection, 'You have a car coming fast on this side?'"

The Witness: "I would begin to stop."

The Court: "This is a practice. Not what he would do, but what the practice is." [This is the construction by the court that the witness was testifying as to practice or custom, not his personal experience.]

Question: "Do you know what the practice is in the industry? Do you understand it when the fireman warns you have one coming on the side coming fast?

The Witness: "You attempt to avoid an accident."

Q: "By doing what?"

A: "By altering the speed of the train."

On cross examination he was asked:

Q: "Now, Mr. Dillard, let's refer to this type train we are talking about again, four diesel A units, 114 cars and a caboose. And you are travelling about 37 to 39 miles an hour and you put the automatic brake valve into service application and draw off about ten pounds of air. That train isn't

---

1. There was no objection that this answer or others herein set out were not responsive to the question.

going to slow down very much in the next one thousand feet ahead of you?"

A: "You will feel the brakes setting."

Q: "You will feel the brakes but it isn't going to slow all the way that train down very much in one thousand feet is it?

A: "A mile or two an hour I would say."

There is some other testimony of Mr. Dillard which is not favorable to the plaintiff, but it will not be considered here.

■ Taking all of the above evidence and circumstances, we are of the opinion that there was some evidence that the engineer failed to exercise ordinary care. He was warned at 1,000 feet that a car was approaching the crossing. The speed of the car was 60 to 65 miles per hour, and it gave no indication that it was reducing speed. The fireman testified that he warned the engineer only of cars which constituted a hazard. The engineer was conscious enough of the possibility of a collision to put his hand on the brake. He did not put it into the lap position which, under Dillard's testimony, would have prepared the train for the application of the brakes and could have saved 3 or 4 seconds. He did not put the brake into the service position which, under Dillard's testimony, would have slowed the train "a mile or two an hour." The engineer himself conceded that if he had eased off on the throttle and reduced the air on the brakes at 1,000 feet it would have slowed the train [by the time it got to the crossing.] The jury was entitled to believe the testimony of Dillard that it was the custom and practice, under similar circumstances, for the engineer to have attempted to avert an accident by applying the brakes and reducing the speed of the train.

■ Even if the driver of a train or an automobile has the right-of-way, he nevertheless must exercise ordinary care. While he is not ordinarily required to anticipate the negligent conduct of others, a duty does arise when he anticipates, or should anticipate, that the other person's conduct is about to bring about a dangerous situation. The person having the right-of-way cannot exercise it with impunity. Thus this court said in McWilliams v. Muse, 157 Tex. 109, 300 S.W.2d 643 (1957), that a statutory right-of-way rule is subject to the qualification that a person entitled to claim such right will exercise it with proper regard for the safety of himself and others. If the person under a statutory duty to yield the right-of-way fails to do so, the exercise of ordinary care may require the operator of the other vehicle to yield. See annotation 3 ALR(3d) 180 at 272 et seq.; 4 Blashfield Cyclopedia of Automobile Law and Practice (3d Ed.) 619.

■ A recognized text explores the proposition that a person may assume that others will act lawfully and carefully. It states that, "Rightfully understood this is sound enough. * * *" But there are exceptions. One of them is "where the facts in a specific case would show to a reasonable man in the actor's position that another person will probably disobey the law this time." 2 Harper & James, The Law of Torts (1956) 942.

■ This court, in a discovered peril case, rejected the contention that no duty arose on the part of the train's operators to do anything until they realized that the other party could not extricate himself and that a collision was imminent. This court approved language that the duty arose when the plaintiff was in a perilous position *or about to enter such a position.* Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561 (1952). Applying that test to this case, the duty arose when the operators should have realized that the automobile was "pursuing a course which will probably terminate in serious body injury. * * *" *Ford,* supra, 252 S.W.2d at 567. We therefore do not agree with the holding of the court of civil appeals in this case that no duty arose until the car

emerged from behind the brush, at which time the crew knew that a collision could not be avoided.

The facts of McWilliams v. Muse, supra, are in some respects similar to those here. Two trucks approached each other at a right-angle rural intersection. One was on a paved road, and the other was on a gravel road. There was a stop sign which called for the truck on the gravel road to stop. The person on the paved road saw the dust of the truck on the gravel road. Other facts were present; but as pertinent here, this court said,

"As the truck approached, and certainly when it began to cross, the paved portion of the highway, it should have been evident to respondent that petitioner might not stop and yield the right-of-way. *The exact time when he should have become aware of this possibility is necessarily a question for the trier of fact.* Under the evidence the trial court [sitting without a jury] could have decided that a reasonably prudent person in respondent's position would have realized the danger when the pickup was 300 feet west of the point of impact. It certainly cannot be said as a matter of law that a prompt application of the brakes at that time would not have reduced the speed of the pickup enough to permit the truck to clear the pavement." 300 S.W.2d at 646.

■ So here, we think that the exact time when the operators of the train became aware that the automobile would not yield was a question for the jury; and, as indicated, we think there is some evidence to support their answer.

The cause-in-fact element of proximate cause is close; i. e., whether the collision would have been averted if the brakes had been applied and the throttle adjusted at or after 1,000 feet from the crossing. As was observed in the *Ford* case, supra, a delay of even a few seconds might have averted the collision. There was evidence that action on the part of the engineer at 1,000 feet would have slowed the train. And there was the testimony from Dillard as to reduction in speed of a few miles per hour by the service application of the brakes. We regard this testimony and the reasonable inferences therefrom to be sufficient to raise the issue for the jury.

■ The railroad had points of error in the court of civil appeals that there was (1) no evidence and (2) insufficient evidence to support the jury's answers to the special issues we have discussed. We have overruled the points as to the issues numbered 6 and 7 as to the failure of the engineer to exercise ordinary care to slow the train. Whether the evidence was factually sufficient to support the answers is not within the jurisdiction of this court. This determination is within the jurisdiction of the court of civil appeals. It expressly found it unnecessary to pass upon such points. The cause, therefore, must be reversed and remanded to that court. In this connection, we agree with the court of civil appeals that there is no evidence to support the finding that the fireman was negligent in failing to apply his emergency brake. There is no testimony, including that of Mr. Dillard, that the fireman should have applied the emergency brake; and its application immediately before the accident, under the undisputed evidence, would not have slowed the train sufficiently to have avoided the collision.

The railroad also has other points including the excessiveness of the damages which should be passed upon by the court of civil appeals.

The judgment of the court of civil appeals is reversed and the cause is remanded to that court.

WALKER, Justice (dissenting).

I respectfully dissent. The testimony of the witness Dillard makes it clear that the

only "practice of the industry" that "required" the fireman to give warning and the engineer to begin slowing the train in the situation outlined in the various hypothetical questions was the practice of exercising care to prevent accidents. It was quite natural then for the witness to answer questions concerning this "practice" by stating what he would have done. He did not at any time speak of a rule or custom or habit or practice or use any word of similar import. This is not surprising. He was not testifying about a rule or custom or habit or practice but was simply describing the precautions that he considered appropriate under the circumstances. The essential meaning of his testimony is not altered in any way by the conclusion of the trial court that the witness, in stating what he would have done, was not stating what he would have done. It is my opinion that Dillard's testimony concerning the "practice of the industry" should have been excluded and that the Court improperly relies upon it to reverse the judgment of the Court of Civil Appeals.

Even if this evidence is considered, I would hold that it affords no support for the jury's findings. The net effect of Dillard's testimony is that a fireman, upon discovering an automobile traveling at a speed of 60 or 65 miles per hour at a distance of 2,000 or 2,500 feet from the crossing, should give some sort of warning that would cause the engineer to begin slowing the train. In other words, he would have the operatives of the train act on the assumption that the driver of an automobile moving at a speed of 60 or 65 miles an hour almost half a mile from the crossing might not stop before reaching the crossing. This is a heavier burden than that imposed by law upon the fireman and engineer.

We are dealing with a railroad crossing protected by signs on the highway ¦some distance from the crossing and by flashing lights operating at the crossing. The highway is practically perpendicular to the railroad tracks, and there was no obstruction that might have prevented the driver of an approaching vehicle from seeing the signs and flashing lights. It further appears from the evidence that the driver of an automobile moving at a speed of 60 miles per hour can, upon becoming aware of a danger, stop the vehicle in a distance of approximately 200 feet. When the automobile in this case was 2,000 or 2,500 feet from the crossing, therefore, the operatives of the train "had a right to assume that the driver would stop it before reaching the crossing. Both ordinary care for his own safety and Article 6701d, Sec. 86(d), Vernon's Ann.Civ.St. required that he stop it." Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561. See also Texas & New Orleans Ry. Co. v. Hart, 163 Tex. 450, 356 S.W.2d 901. In this case, of course, it would be Section 86(a) of Article 6701d that required the driver to stop.

It is evident, moreover, that the firemen with whom Dillard had worked adhered to the "practice" of giving no warning of an approaching vehicle unless and until there was immediate danger of a collision. This is suggested by his testimony that he would begin to stop upon being warned that a car was coming up fast on the fireman's side of the train. It is made clear by his answer, in response to other inquiries concerning the "practice in the industry," that the fireman does not warn of every car he may see approaching the intersection but only "cars that he thinks are in danger of collision." If that is 'the understanding between the fireman and engineer, the latter undoubtedly should begin slowing the train upon being warned by the fireman that an automobile was approaching. Indeed, the engineer would ordinarily be guilty of negligence if he failed to apply the emergency brakes.

The fireman on respondent's train was somewhat more cautious than those whose practices Dillard had observed. He did

**556**

not wait until the automobile "was in danger of collision" before warning the engineer. When he first saw the automobile, he warned the engineer that a car was "coming up on my side pretty fast" and to "blow your whistle for all it has got." The engineer was already blowing the horn and continued to do so. This is all that either he or the fireman was required to do in the exercise of reasonable care at that time and thereafter until a person of ordinary prudence would have realized there was danger that the driver of the automobile would not stop it. Upon realizing that the driver probably would not stop his vehicle before it reached the crossing, the fireman gave further warning to the engineer and the latter applied the emergency brakes. It was then too late to avoid the collision.

In my opinion Dillard's testimony concerning the "practice in the industry" constitutes at best a bare scintilla of evidence that the collision was proximately caused by any negligence on the part of either the fireman or engineer. It is not proper, of course, to find support for the negligence findings in the situation as it existed when the automobile was perhaps 300 or 400 feet from the crossing and then look to what the fireman and engineer might have done when the train was 1,000 feet from the crossing to support the proximate cause findings. There is no evidence of any fact or circumstance from which it can reasonably be concluded that a person of ordinary prudence in the position of the train operatives would have realized, at a time when the speed of the train could have been slowed sufficiently to avoid the collision, that there was danger that the driver of the automobile would not stop. It is my opinion that the record does not support the jury's findings on which the liability of respondent must rest, and I would affirm the judgment of the Court of Civil Appeals.