**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00198-CV**
_____

**MINGRUN, INC. D/B/A/ GOLDEN CHOPSTICKS, Appellant**

**V.**

**TELINA WHEATON, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF BOBBY JOE NATHAN JOHNSON, Appellee**

_____

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-02-02017-CV**

_____

**MEMORANDUM OPINION**

In this personal injury case, Mingrun, Inc. d/b/a/ Golden Chopsticks ("Mingrun") appeals a judgment rendered against Mingrun after a bench trial. Pedestrian Bobby Joe Nathan Johnson, age twenty-seven, was struck by a vehicle and injured when Johnson tried to cross from one side of FM 1488 to the other side at night. On the evening of his accident, he had walked from the apartment complex where he lived to a gas station convenience store directly across the road. He was hit

1

when he was crossing back over FM 1488 after buying some cookies. Johnson died two days after the accident. The vehicle that hit Johnson that night was driven by Aaron Pease, a delivery driver for Mingrun.

Appellee Telina Wheaton, Individually, and as Representative of the Estate of Bobby Joe Nathan Johnson ("Wheaton") sued Mingrun, asserting wrongful death and survival claims. Wheaton alleged negligence per se, negligence, negligent hiring, supervision, training, and retention, and she alleged that Mingrun was liable under a theory of respondeat superior. After a bench trial, the trial court ordered judgment against Mingrun for 1.6 million dollars.[1] Mingrun appealed. For the reasons stated herein, we affirm.

---

[1] The Final Judgment awarded wrongful death damages in the amount of $1,601,997.60 and survival damages in the amount of $136,323.85, together with prejudgment and post judgment interest at the rate of 5%. Although Appellant generally states in its brief on appeal that there is "nothing to support the trial court's rendering a judgment of $1.6 million against Mingrun[,]" Appellant does not specifically challenge or include any discussion or briefing about the calculation, amount, or sufficiency of the evidence to support any of the damages, and we will not address any unassigned error relating thereto. *See, e.g.*, *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998); *Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex. 1987). "Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006) (citing *In re B.L.D.*, 113 S.W.3d 340, 350-52 (Tex. 2003)).

Evidence at Trial

Testimony of Aaron Pease

Aaron Pease testified that he worked for the Golden Chopsticks restaurant for about a year and a half. He recalled that the application process included submitting an application and talking with a woman who was one of the bosses, the person with whom he spoke made sure he had a driver's license, and she told him to "be [a] great driver[] and be aware" on every delivery.

Pease agreed that, to be safe on the road, drivers should follow rules of the road, including the speed limit, defensive driving, stopping at red lights and stop signs, and watching for other drivers. He also agreed that drivers should not drive while under the influence of drugs or alcohol because the drugs can impair the ability to drive. Pease stated that he was taught to "keep an eye forward when you drive[.]" He agreed that drivers should be aware of people and drivers on the road and always focus on the road when it is dark or rainy. According to Pease, Golden Chopsticks did not offer him any training for driving.

According to Pease, on the day of the accident, he was working as a delivery driver for the Golden Chopsticks restaurant, his shift began around 5 p.m., and sometime after 8:10 p.m. he was headed to make a delivery, proceeding eastbound on FM 1488, in the far right-hand lane of traffic, traveling at about 45 to 50 mph. The highway was a "five-lane" road, two lanes for eastbound traffic, a center turning

3

lane, and two lanes for westbound traffic. The Golden Chopsticks restaurant was located about half a mile from where the accident happened. Pease stated he was driving and assessing the road ahead of him, and about "20 feet before the impact" he had just "glanced at the gas station and then about two seconds later, [he] saw a faint figure going across the road." The gas station was on his left, and it was in the direction from which the pedestrian was traveling from at the time of the accident. Photographs taken by the Department of Public Safety officers at the scene were admitted as Plaintiff's Exhibit 8.

Pease testified that he did not "smoke any weed" while he was on the job, he did not believe he had smoked "any weed" that day, and he did not believe he had any THC in his system at the time of the accident. The Plaintiff offered, and the trial court admitted, the toxicology report of the blood draw taken from Pease after the accident. The Plaintiff's attorney examined Pease about the test results which reflected Pease tested positive for two THC metabolites. Pease stated he was not high or intoxicated when he was working that day, he had smoked nothing that day, but in his "past" he had "smoked[.]" Pease testified that he did not know whether THC affected his reaction time because he "never had much experience with the drug[]" and he had only smoked it "[v]ery rarely[,]" about "every other week," and he said he had not smoked it on the day of the accident.

4

He agreed that on the evening of the accident, he was making a delivery for Golden Chopsticks when the incident occurred, and he hit a young man who was a pedestrian. Pease testified that he had driven about a mile before the impact occurred. Pease recalled that it was dark, the roads were not wet at the time, and his headlights were on. Pease testified that his vehicle had automatic headlights that turn on in the dark. He believed his headlights projected about ten to fifteen feet in front of the car, and he stated he did not see the pedestrian, Bobby Johnson, "until the very last second when he was right in front of [my] car."

When asked what he saw before the impact, Pease replied,

From my perspective, I had about two seconds to react. He was running -- maybe jogging across the road on 1488, and I saw him for a split second or two before the impact happened.

. . .

It happened so quick. All I could think to do was lay on the brakes, because I didn't have time to even look in my side mirrors and try to swerve into the left lane because I could have hit another vehicle.

. . .

About 20 feet before the impact happened, so about two or three seconds, I would say, I glanced at the gas station and then about two seconds later, I saw a faint figure going across the road.

. . .

…I had very little time to react and maybe try to get in the left-hand lane. It was a split-second reaction, and all I could do was brake.

. . .

When I saw his shadow in the street, it was about one and a half seconds. And then as soon as I saw the individual, he was already 2 feet from my car.

. . .

[I]t was dark and I really had no vision until the person was right in front of my vehicle.

According to Pease, after the accident, he pulled over on the side of the road, called 911, and he performed CPR on the victim.

Pease recalled that police took him to a facility for a blood test after the incident, but he did not know that the drug test analysis showed there was THC in his system at the time of the accident. When asked whether he took personal responsibility for the wreck, he replied,

> I believe that it's a really sad story and it gave me anxiety for months and I had to go to therapy because of it, but I've come to terms with myself, sadly, that the man was crossing the intersection, not at a crosswalk. It was dark. He was wearing dark clothing. And I don't believe I'm responsible for what happened., and I don't believe Golden Chopsticks is responsible for what happened.

Pease testified there was a crosswalk about 100 to 200 feet away from where the impact occurred, and Bobby Johnson was not on or near the crosswalk when the accident occurred. Pease explained that there was not "very much lighting[]" in the area and the closest lights would have been at the intersection ahead of him or at the gas station—about twenty to thirty feet away. Pease recalled that the victim was wearing dark clothing and was not "illuminated by light[.]" Pease was driving in the right-hand lane, he saw Johnson's shadow to his left, the gas station was to Pease's left, and the impact occurred when Pease and Johnson both were in the right lane.

Pease was asked about the police report, and he agreed with the report's statement that the pedestrian was at fault for failing to yield the right-of-way to his

6

vehicle. Pease testified that his vehicle had the right-of-way, based on his knowledge as a driver.

Testimony of Jase Hollas

Jase Hollas testified that he was pumping gasoline at the gas station when the accident occurred. According to Hollas, it was "pretty dark in that area[,]" and there were no street lights. Hollas did not believe the car's headlights were on, but Hollas explained that the police told him they had video footage showing the vehicle lights were on at the time of the accident, and he stated that it was a "really dark area[.]" Hollas recalled that the driver of the car that hit Johnson immediately pulled over to the side of the road, and when the driver got out of his car, he seemed "pretty freaked out[.]" Hollas testified that the pedestrian was walking across the street, and the pedestrian was not in a crosswalk. According to Hollas, the pedestrian was "a handicapped man," and Hollas thought it might have been difficult for him to walk another forty to fifty yards to the crosswalk. On cross-examination, Hollas explained the location of the crosswalk and why he thought Johnson crossed the road where the accident occurred:

> [Counsel for Defendant]: …Was there any kind of pedestrian light that would guide Mr. Johnson to cross the street?
>
> [Hollas]: No, sir. That's one thing that was bad about it is -- it's hard to explain on Zoom, but the gas station, the driveway to the gas station was almost directly across from the entrance to the apartments. And so if you walk straight across, it wasn't very far. But in order to get to the crosswalk, which is probably another, I don't know, maybe 50 yards,

7

40 yards from the gas station, he has to walk all the way there, go to the crosswalk, cross it, and walk back to the apartment complex. And he was a handicapped man, I know, so that would be pretty difficult for him, I guess, so he just crossed right there. But it was very dark and there were not lights, like, you couldn't just see somebody crossing the road, just like a deer.

[Counsel for Defendant]: And just to elaborate what you said, so the gas station was across from the apartment complex, so you implied that the most convenient walk from the gas station to the apartment would be to walk the way Mr. Johnson did.

[Hollas]: Yes.

Testimony of Telina Wheaton

Telina Wheaton—Bobby Johnson's mother—testified that Bobby was her only son, and he was born with spina bifida, which had caused physical problems for Bobby. When Bobby was a boy, she had been told that he may never be able to walk. But after physical therapy, Bobby was able to walk, and she believed he walked as fast "as a normal person[.]" Wheaton testified that Bobby would walk everywhere, he walked to the store "a lot[,]" and he had walked to the store "over a hundred times" before the accident. According to Wheaton, Bobby crossed the road from their apartment to the gas station "directly[]" because there was no crosswalk from the apartment and "it was easier to just cross across the street" rather than taking the crosswalk at the intersection which was "a longer way." Wheaton considered Bobby to be safe when he was walking, and she said Bobby looked both ways before crossing the street.

8

Wheaton stated that she was with Bobby all day on the day the accident happened. Then at some point she took a nap. She learned of the accident after her husband saw ambulances and her husband asked her "where [is] Bobby" and she told him she "didn't know." Her stepdaughter then told her Bobby had gone to the store to get some cookies, her husband immediately left and then returned and informed her Bobby had been hit, and they went to the hospital. A surgeon at the hospital told them that Bobby had a traumatic brain injury, that "his neck had snapped," and that he probably would not ever be able to breathe on his own. At some point, after learning that Bobby would always be in a vegetative state and he would never be able to breathe on his own, she decided to take him off the life support machines. Bobby then died at the hospital.

Testimony of Shuxian Huang

Shuxian Huang testified as a representative of Mingrun through an interpreter. Huang testified that he was the president of Mingrun, and he was also a manager and cook at Golden Chopsticks located at 9420 FM 1488, and at the time of trial, the restaurant had closed. Huang stated that he did most of the interviewing and hiring for the restaurant, and candidates for job openings did not complete an application, but they were usually asked for their driver's license and driving record. According to Huang, because the business was small, they did not do an "actual background check[]" or drug test or ask Pease if he used drugs or alcohol. Huang testified that

9

he trained kitchen staff and he instructed delivery drivers, "no speeding, follow the traffic rule." He also testified that he did not have Pease do a training ride-along with another delivery driver or with himself, nor did he have anyone ride with Pease to make sure he was a safe driver. Huang recalled that Pease was the delivery driver for the restaurant on April 2, 2019, and he was employed from September 2016 until May 2019. Huang agreed that he did not run a background search or obtain a paper copy of Pease's driving record, but he got his driver's license and Social Security number. When asked whether he had any way of knowing whether Pease broke the law during deliveries other than if he reported it himself, Huang replied, "[u]sually he would tell us[.]"

On cross-examination, Huang testified that Pease was "17 or 18[]" when he was hired, and he thought this was Pease's first job. According to Huang, he would not usually ask job applicants many questions "because they are young people, usually just want to get the job [] to have some [] money." Huang also testified that he had not seen Pease using drugs or alcohol and no employees had reported to him that Pease was under the influence of drugs or alcohol while at work. Huang further testified that he would not allow people to work as a delivery driver if they were "under the influence[.]" When asked what the policy on safe driving was, Huang replied, "[u]sually they take the food, deliver to the customer and bring back the money to me."

10

A transcript of Huang's deposition was admitted into evidence as Plaintiff's Exhibit 12. In his deposition, Huang testified that he orally asked job applicants how their driving was, whether they had been involved in an accident, and for their driver's license. He also testified that he would ask job applicants if they had ever done anything unlawful. When asked whether he rode along with newly hired drivers, Huang responded, "Well, because each one of them held their own [] valid driver's license so I don't have the right to sit in over there and teach them how to drive." Huang also testified that he did not check Pease's previous employment history or driving record, and that Pease received two days of job training. Huang also testified that according to the police report, "Aaron did nothing wrong…and it was not Aaron's fault" and "[m]y company is not at fault, my employee is not at fault, Aaron is not at fault." Huang also agreed that he depended on his employees to tell him if they did something wrong or he waited for a complaint from a customer.

Testimony of Deepak Sabiki

Deepak Sabiki testified as an expert for the Plaintiff. Sabiki stated that his education and experience fell within the scope of econometrics and quantitative economics, and he works with statistics and data sets to analyze earning capacity. He testified that he considers medical expenses as an offset to earnings in making a consumption calculation. Sabiki calculated Bobby Johnson's lost earning capacity

11

to be approximately $862,000, and the net after medical and other expenses was approximately $750,000. Sabiki's report was admitted as Plaintiff's Exhibit 10.

On cross-examination, the defense asked about Johnson's projected earnings and what education attainment the projection included. Sabiki agreed that the projection was based on Johnson completing his Associate degree, which he began in 2018 and had expected to complete by 2020. Sabiki also agreed that he had not included Johnson's medical conditions—including spina bifida, hydrocephalus neurogenic bladder, and lower extremity debilitation—in estimating what kinds of jobs Johnson might be able to have or the effect on Johnson's life expectancy, and that he did not rely on a vocational expert or medical opinion in estimating damages. Sabiki also testified that the estimate of Johnson's future medical expenses was based on population averages and not based on a demographic with the same medical conditions as Johnson.

Other Evidence

Seven videos were admitted into evidence and played for the trial court. The court also admitted into evidence the hospital records and Johnson's death certificate. The hospital records had statements in them about the accident. One statement apparently made by Pease was, "he just walked out in front of me and I hit him[,]" and Johnson "apparently was crossing a street when he was hit by a vehicle going 50 mph." A "Toxicology (Drugs) Laboratory Report" for Aaron Pease

12

was admitted into evidence, and it showed 245 nanograms per milliliter of a THC metabolite and 23 nanograms per milliliter for Delta-9-THC. Witness statements, including Pease's statement, that were made to the Conroe police officers were also admitted. A police report entered as a defense exhibit stated the investigating officer's "Narrative Opinion of What Happened[,]" referring to Pease's vehicle as "Unit #1" and Johnson as "Unit #2" stating:

> Unit #2, pedestrian, was attempting to cross the 2500 block of FM 1488 where there was no cross walk. Unit #1 was traveling eastbound in the right lane of the 2500 block of FM 1488. Unit #1 did not see Unit #2. Unit #1 struck Unit #2. Unit #2 was killed as a result of the impact. Unit #2 at fault, Pedestrian Fail to yield the Right of Way to Vehicle.

Defendant's Exhibit 8 includes the accident report of an officer with the Conroe Police Department and stated in part that the video obtained from the gas station "does show that [Pease's vehicle's] headlights were on at the time of the incident and did come to an immediate stop after impact."

Two of the video exhibits show Johnson walking inside the store and outside, walking away from the gas station. Two videos depict a police officer at the scene talking with witnesses, and one of the witnesses said he did not think the vehicle that hit Johnson had its lights on. Two videos show Pease talking to a police officer at the scene, and Pease states his vehicle's lights were on, were also automatic, and that his lights allowed him to see "ten to twenty feet[.]" In the seventh video, Jase Hollas told a police officer he saw a handicapped man crossing the road, he was not sure

13

whether the vehicle had its headlights on, and the officer said "they really couldn't tell from looking at the camera[]" at the gas station whether the headlights were on.

## Final Judgment

After the close of the Plaintiff's case in chief, Mingrun moved for a directed verdict, which the trial court denied. In its Final Judgment, the trial court rendered judgment against Mingrun and ordered that Wheaton recover $1,601,997.60 individually from Mingrun and that Wheaton recover $136,323.85 as the representative of Bobby Johnson's estate. Over twenty days after the Judgment was signed Mingrun filed Defendant's Request for Entry of Findings of Fact and Conclusions of Law, the trial court did not issue any findings or conclusions, and Mingrun did not file a Notice of Past Due Findings of Fact and Conclusions of Law as required by Rule 297 of the Texas Rules of Civil Procedure. Mingrun filed a motion for new trial and a first amended motion for new trial, in which Mingrun complained that there was no evidence or insufficient evidence of negligence, causation, respondeat superior, and negligence per se. Mingrun asserted that the trial court erred in allocating more than 50% negligence to the Defendant and erred in placing 0% contributory negligence on Johnson. The trial court denied the motions for new trial after a hearing. Mingrun timely filed its notice of appeal.

## Issues

In its first issue, Appellant argues the evidence was not legally sufficient to support a judgment of liability by Mingrun because there was no evidence that Golden Chopsticks was negligent in hiring, training, or supervising and no evidence that driver Aaron Pease was negligent. Appellant argues that, even if Pease was found negligent, there was no evidence that Mingrun had a duty to supervise or train Pease as a delivery driver or that it was negligent in hiring Pease. In its second issue, Appellant argues that the trial court did not consider Johnson's contributory negligence and that the police report did not find Pease was at fault in the accident. And in its third issue, Appellant argues that the trial court erred by admitting a "hearsay drug report" that showed Pease had "residual THC chemicals" in his blood. According to Appellant, it was error to admit the report with no testimony by a medical expert on how the THC residual was relevant to the cause of the accident or relevant to Mingrun's alleged negligent hiring, training, or supervision.

## Standard of Review

The parties elected to try the case to the bench. Therefore, the trial court, as factfinder, was the sole judge of the credibility of the witnesses and weight of the

evidence, and it was responsible for resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts.[2]

In a legal sufficiency challenge, we credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it.[3] When a party challenges the legal sufficiency of the evidence on an issue for which it did not have the burden of proof, the appellant must show there is no evidence to support the adverse finding.[4] In reviewing a no-evidence challenge, we view the evidence in the light most favorable to the verdict.[5] We cannot sustain a legal insufficiency, or no evidence point, unless the record shows:

> (1) ...a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.[6]

When, as here, the trial court does not issue findings of fact and conclusions of law following a bench trial, the fact findings necessary to support the trial court's

---

[2] *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-21 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004).
[3] *See City of Keller*, 168 S.W.3d at 827.
[4] *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983).
[5] *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex. 1992).
[6] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (citations omitted).

judgment are implied.[7] And we must affirm the trial court's judgment if it can be upheld on any legal theory that finds support in the evidence.[8] The final test for legal sufficiency on appeal is whether the evidence at trial would enable reasonable and fair minded people to reach the verdict under review.[9]

Evidentiary rulings are committed to the trial court's sound discretion.[10] A trial court abuses its discretion when it acts without regard for guiding rules or principles.[11] "The trial court has extensive discretion in evidentiary rulings, and we will uphold decisions within the zone of reasonable disagreement."[12] Even if the trial court abused its discretion in ruling on the admission or exclusion of certain evidence, reversal is appropriate only if the error was harmful—that is, it probably resulted in an improper judgment.[13] We will uphold a trial court's ruling on the

[7] *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003).

[8] *See In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984) (citing *Lassiter v. Bliss*, 559 S.W.2d 353 (Tex. 1977)).

[9] *City of Keller*, 168 S.W.3d at 820.

[10] *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012) (citing *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam)).

[11] *Id.* (citing *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)).

[12] *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018).

[13] *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *see also* Tex. R. App. P. 44.1.

admission of evidence if there is any legitimate basis for the ruling.[14] A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the evidence excluded or admitted.[15]

## Negligence

To prove negligence, a plaintiff must present evidence of (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach.[16] "[P]roximate cause need not be supported by direct evidence, as circumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation."[17]

A driver has a general duty to exercise the ordinary care a reasonably prudent person would exercise under the same or similar circumstances to avoid a foreseeable risk of harm to others.[18] Drivers have the duty to "control the speed of the vehicle as necessary to avoid colliding with another person or vehicle that is on

---

[14] *See Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011); *Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 762 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *Hooper v. Chittaluru*, 222 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (op. on reh'g)).

[15] *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000) (citing *Alvarado*, 897 S.W.2d at 754).

[16] *Holcomb v. Randall's Food Mkts., Inc.*, 916 S.W.2d 512, 514 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

[17] *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987).

[18] *Williamson Cty. v. Voss*, 284 S.W.3d 897, 902 (Tex. App.—Austin 2009, no pet.).

or entering the highway[.]"[19] Drivers also have the general duty to keep a proper lookout.[20] "The duty to keep a proper lookout encompasses the duty to observe, in a careful and intelligent manner, traffic and the general situation in the vicinity, including speed and proximity of other vehicles as well as rules of the road and common experience."[21] "The failure to keep a proper lookout can be a proximate cause of an accident where the motorist should have seen something in time to have avoided the accident by evasive action and but for such failure the collision could have been avoided."[22] Generally, whether a driver kept a proper lookout in an automobile negligence case is a question for the factfinder.[23] A driver who has the right-of-way should still exercise ordinary care in proceeding.[24] "When there is other evidence that the driver was negligent, then a driver's intoxication may be considered by the [factfinder] as probative evidence to be considered along with other factors, such as driving ability, vigilance, judgment, and reactions."[25] Under

---

[19] Tex. Transp. Code Ann. § 545.351(b)(2).

[20] *Montes v. Pendergrass*, 61 S.W.3d 505, 509 (Tex. App.—San Antonio 2001, no pet.).

[21] *Carney v. Roberts Inv. Co., Inc.*, 837 S.W.2d 206, 210 (Tex. App.—Tyler 1992, writ denied).

[22] *Montes*, 61 S.W.3d at 510.

[23] *Clodfelter v. Martin*, 562 S.W.2d 491, 493 (Tex. App.—Corpus Christi 1977, no writ) (citing *Arrington v. Paschall*, 352 S.W.2d 866 (Tex. App.—Dallas 1962, writ ref'd n. r. e.).

[24] *See Stanley v. S. Pac. Co.*, 466 S.W.2d 548, 553 (Tex. 1971).

[25] *See Cravens v. Alisam Enters., LLC*, No. 09-19-00020-CV, 2021 Tex. App. LEXIS 677, at **16-17 (Tex. App.—Beaumont Jan. 28, 2021, pet. denied) (mem. op.).

the theory of vicarious liability (or respondeat superior), an employer may be held liable when the negligence of its employee, acting in the scope of his employment, is the proximate cause of another's injury.[26]

Negligent hiring, retention, and supervision claims are negligence causes of action based on an employer's direct negligence rather than on vicarious liability.[27] Under the tort of negligent hiring and supervision, an employer who negligently hires an incompetent or unfit individual may be directly liable to a third party whose injury was proximately caused by the employee's negligent or intentional act.[28] Negligence in hiring requires that the employer's failure to investigate, screen, or supervise its employees proximately caused the injuries the plaintiff alleges.[29]

The plaintiff's original petition stated claims against Mingrun for: (1) negligence per se, (2) vicarious liability for the negligence of Pease, and (3) negligent hiring, supervision, training, and retention by Golden Chopsticks. We may uphold the trial court's judgment against Mingrun if the evidence is sufficient under either a theory of direct or vicarious liability.

---

[26] *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018); *DeWitt v. Harris Cty.*, 904 S.W.2d 650, 654 (Tex. 1995).

[27] *See Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214, 225 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (citations omitted).

[28] *See Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 311 (Tex. 2019).

[29] *See Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 796 (Tex. 2006).

Pease testified that he was looking at the gas station to his left just before he hit Johnson. He also testified that he had about two-to-three seconds or about twenty feet to stop when he saw Johnson's shadow, he did not have time to move into the left lane, and all he could do was brake. Pease testified that his headlights were on and that his car had "automatic" headlights. That said, in a video admitted into evidence without objection, an eyewitness to the accident (Hollas) told the police that he did not think Pease's headlights were on, and that same witness testified at trial that he did not believe Pease was driving with his headlights on but Hollas also testified that the police told him they had video evidence from the store that showed the car's headlights were on. None of the law enforcement officers testified at trial, and although video from the store was entered into evidence at trial, there was no testimony or commentary about the videos presented during trial. Additionally, a toxicology report showing results from Pease's blood draw taken after the accident revealed the presence of THC metabolites. It was the trial court's role as factfinder to resolve discrepancies in the evidence, including the statement in the police report that video from the store showed Pease's headlights were on and the statement on the video of a police officer saying "they really couldn't tell from looking at the camera[]" at the gas station whether the headlights were on.[30] The trial court could

---

[30] *City of Keller*, 168 S.W.3d at 819-21.

21

have believed Hollas's testimony and disbelieved Pease about the headlights.[31] The trial court could have also concluded based on the testimony and exhibits in evidence that Pease was looking off to his left at the gas station at the time of impact and that he failed to keep a proper lookout.[32] Although the police report stated that Johnson failed to yield the right-of-way to Pease, the trial court could have concluded that, even if Pease had the right-of-way, he failed to exercise ordinary care as a motorist and that Pease's negligence was a proximate cause of the accident, and further that Johnson's failure to yield the right-of-way was not a proximate cause of the accident.[33]

It is undisputed that Pease was working as a delivery driver for Golden Chopsticks when the accident occurred. The trial court could have found Mingrun vicariously liable for the negligence of Pease, under the doctrine of respondeat superior.[34] Because we conclude the evidence is sufficient to support a judgment against Mingrun under a theory of vicarious liability, we need not determine whether the evidence is also sufficient to show that Mingrun was directly liable for the

---

[31] *See id.*
[32] *See* Tex. Transp. Code Ann. § 545.351(b)(2); *Montes*, 61 S.W.3d at 509; *Carney*, 837 S.W.2d at 210.
[33] *See Stanley*, 466 S.W.2d at 553; *Holcomb*, 916 S.W.2d at 514.
[34] *See Painter*, 561 S.W.3d at 131; *DeWitt*, 904 S.W.2d at 654.

negligent hiring, supervision, training, or retention of Pease.[35] We overrule Appellant's first issue.

"Contributory Negligence" or "Assumption of the Risk"

In its second issue, Appellant argues that the trial court "has not considered the contributory negligence of the victim" and that without evaluating Johnson's contributory negligence, there cannot be an adverse judgment against Mingrun. Contributory negligence in this context generally "contemplates an injured person's failure to use ordinary care in regard to his or her own safety."[36] Under the Texas Comparative Responsibility Act, "a claimant may not recover damages if his percentage of responsibility is greater than 50 percent."[37]

Mingrun did not specifically plead contributory negligence or proportionate responsibility in its answer, although Mingrun alleged in its answer that Johnson was solely at fault for failing to yield the right-of-way to traffic and failing to use the crosswalk to cross the highway.[38] Appellee contends Mingrun failed to plead contributory negligence and therefore it cannot complain about it on appeal.

---

[35] *See* Tex. R. App. P. 47.1.

[36] *Kroger Co. v. Keng*, 23 S.W.3d 347, 351 (Tex. 2000).

[37] *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.001.

[38] *See MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 135-37 (Tex. 2014) (explaining that affirmative defenses must be "properly raised in pretrial pleadings[]") (citing Tex. R. Civ. P. 94); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 243 (Tex. 1985) ("Contributory negligence is an affirmative defense which must be pleaded.").

Assuming without deciding that Mingrun sufficiently pleaded contributory negligence or proportionate responsibility, we cannot say the trial court erred because Mingrun had the burden of proof on that issue,[39] and "[t]he determination of [the] negligent parties' proportionate responsibility is a matter within the [fact-finder's] sound discretion[.]"[40] On this record, considering we do not have any findings of fact or conclusions of law, we cannot say the trial court "failed to consider" the alleged contributory negligence of Johnson.[41] The trial court could have considered the allegations made by Mingrun and decided that Mingrun failed to meet its burden of proof to establish Johnson was negligent or failed to prove that Johnson's alleged negligence was a proximate cause of the accident. In that regard, the trial court could have considered and then rejected the Defendant's allegations that Johnson was contributorily at fault for the accident.[42] To the extent, if any, Mingrun is making a factual-sufficiency challenge on this issue, we may not pass upon the witnesses' credibility or substitute our judgment for that of the factfinder,

---

[39] *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156-57 (Tex. 2015) (explaining that the defendant bears the burden of proof to present sufficient evidence to establish an affirmative defense).

[40] *See Bechtel Corp. v. CITGO Prods. Pipeline Co.*, 271 S.W.3d 898, 920 (Tex. App.—Austin 2008, no pet.) (citing *Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 659-60 (Tex. App.—Dallas 2002, pet. denied)).

[41] *See Blagoev v. Hinderman*, No. 01-02-01336-CV, 2005 Tex. App. LEXIS 4701, at *4 (Tex. App.—Houston [1st Dist.] June 16, 2005, no pet.) (mem. op.).

[42] *See Pharo v. Chambers Cty.*, 922 S.W.2d 945, 948 (Tex. 1996) ("Because the trial court did not render findings of fact or conclusions of law, we must assume that it made all findings in support of its judgment[.]").

even if we might have viewed the factual evidence differently.[43] For similar reasons, we reject Mingrun's argument on appeal that Johnson "assumed the risk" in crossing the road and that the trial court erred in failing to consider "assumption of the risk" in the judgment. Under Texas law, assumption of the risk is no longer a defense to ordinary negligence actions,[44] and it retains only limited application to facts and cases that simply are not before us in our record.[45]

The Final Judgment ordered judgment against Mingrun and damages for Wheaton. The trial court issued no findings of fact and conclusions of law.[46] As we have explained, when the trial court does not issue findings of fact and conclusions of law following a bench trial, all fact findings necessary to support the trial court's

---

[43] *See 2900 Smith, Ltd. v. Constellation New Energy, Inc.*, 301 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

[44] *See Farley v. M Cattle Co.*, 529 S.W.2d 751, 758 (Tex. 1975).

[45] For example, in products liability cases, assumption of the risk may be included under the defense of contributory negligence. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 428 (Tex. 1984). It may have some application if the plaintiff was injured while attempting to commit a felony or suicide, or if the plaintiff knowingly and expressly consented orally or in writing to the dangerous activity. Tex. Civ. Prac. & Rem. Code Ann. § 93.001(a); *Farley*, 529 S.W.2d at 758.

[46] Twenty-six days after the Judgment was signed the Defendant made a written request for findings of fact and conclusions of law. Texas Rule of Civil Procedure 296 requires the written request for findings to be made within 20 days from the date the Judgment was signed. *See* Tex. R. Civ. P. 296. Defendant argued its request should still be considered timely because the trial court later entered an order of sanctions against the defense attorney. Even assuming without deciding the request was timely, the Defendant also failed to file a Notice of Past Due Findings as required by Rule 297 which waives any right to challenge the trial court's findings on appeal. *See AD Villarai, LLC v. Pak*, 519 S.W.3d 132, 137 (Tex. 2017); Tex. R. Civ. P. 297.

judgment are implied.[47] The evidence at trial included testimony by Pease that Johnson was wearing dark clothing, and crossing an otherwise dark road at night, and testimony by Pease and Hollas that Johnson was not crossing the road in the nearby crosswalk. The police report admitted into evidence stated that Johnson, as the pedestrian, was at fault for failing to yield the right-of-way to the vehicle. There was no evidence presented to the trial court about the risks of a pedestrian crossing the road in question at the location in question. The police officers did not testify at trial. The record included evidence that Johnson had crossed the same road possibly one hundred times before, that although he had a visible handicap from spina bifida, he could walk as fast as anyone else, that he walked everywhere, including to the store, and witnesses standing at the gas station saw Johnson leave the gas station parking lot and enter the roadway to cross the road. The trial court could have concluded that the Defendant failed to meet its burden of proof to establish or support a finding against Johnson for comparative fault and proportionate responsibility.[48] At trial, Mingrun did not notify the trial court of the overdue findings of fact and conclusions of law. Mingrun also did not request a finding on proportionate responsibility, nor did it request in any of its post-trial pleadings that

---

[47] *See Shields Ltd. P'ship*, 526 S.W.3d at 480; *Pharo*, 922 S.W.2d at 948.

[48] *See Rosemond*, 331 S.W.3d at 766 ("In the absence of findings of fact or conclusions of law, a trial court's judgment will be upheld on any theory supported by the record, and any necessary findings of fact will be implied[.]") (citations omitted).

the trial court modify the judgment to reduce the award of damages to account for alleged negligence by Johnson. In its Motion for New Trial and First Amended Motion for New Trial, Mingrun asserted a challenge to the sufficiency of the evidence on the liability issue, and Mingrun argued there was insufficient evidence that "Aaron Pease was over 50.1% contributorily negligent." Deferring, as we must, to the trial court's role as factfinder and responsibility to resolve any conflicts in the evidence, the trial court could have concluded that Mingrun failed to establish Johnson's negligence, and we find there was both factually and legally sufficient evidence for the trial court to have concluded that Pease was negligent and that his negligence was a proximate cause of the accident.[49] We overrule Appellant's second issue.

Admission of Evidence

Appellant stated in its opening brief that the trial court

…committed a reversible error to admit a hearsay drug report over the objections of the Appellant/Defendant legal counsel[] by showing the Driver Aaron Pease was negligent in causing the fatal accident when the blood draw report showed residual THC chemicals in the Driver Aaron Pease's body, without the guidance of a medical expert who can testify how the THC residual in the Driver's body has any relevance in causing the fatal accident, or how the THC residual in Aaron Pease Body may cause Appellant/Defendant Mingrun negligence in hiring, training or supervise the Driver in the fatal automobile accident.

---

[49] *See City of Keller*, 168 S.W.3d at 819-21; *Sw. Bell Tel. Co.*, 164 S.W.3d at 625.

In its reply brief, Appellant made the same argument, and it also argued that the report was "inadmissible, prejudicial and also without probative value[.]"

Appellant's briefs do not identify which exhibit contained the drug report; however, Appellee's brief states that the toxicology report was part of Plaintiff's Exhibit 8. Plaintiff offered Exhibit 8 into evidence at an early stage of the trial, and the Defendant objected at that time that the exhibit was a "collection" of documents attached to a business records affidavit and that there would be "hearsay within hearsay" on some documents and authentication issues. The court asked the Defendant to specify what his specific objections were as to each document within Exhibit 8. The following exchange between the trial court and the defense attorney followed about certain pages:

> The Court: But my question to you, Mr. [Defense Attorney] is do you have a different type of objection besides the authentication issue and the hearsay issue? I mean, is there something else I'm going to find on page 27 that relates to a different legal objection that you wish to lodge?
>
> [Counsel for Defendant]: Well, I would believe that the toxicology -- so hang on. Even though there is a statement of qualifications on the testing, we are unsure whether it sufficiently overcomes 702. And that refers to the --
>
> The Court: I have no idea what that means. Are you saying that the Texas Crime Lab is an unreliable expert? Is that your argument? Rule 702 has to do with experts.
>
> [Counsel for Defendant]: Okay.
>
> The Court: Is that the complaint?

28

[Counsel for Defendant]: Put it that way, perhaps not. Give me one second. This is my first time seeing this complete set of exhibit[s]. Give me just one second.

Okay. And then moving forward, as far as the photos, that can be found from page 37 to, I believe, to 54, even though it was part of the disclosure from the Conroe Police Department, there is nothing to indicate who actually took the photos. And, Your Honor, I believe that's hearsay within hearsay.

The Court: That's overruled.

[Counsel for Defendant]: Okay. Then, Your Honor, I have no more objections.

Other than a general objection about hearsay within hearsay and authentication, the Defendant failed to articulate a specific objection about a lack of an expert to establish whether the toxicology report and the presence of THC in the driver's blood at the reported levels would cause impairment.

After the toxicology report was admitted, during the examination of Pease, the Plaintiff's attorney referred to the police file and the toxicology report that was part of the police records, and asked Pease why the results showed he had THC and Delta-9-THC in his system at the time of the accident. Defendant's attorney made no objection to that line of questions. On cross-examination, Defendant's attorney then revisited the issue and the following exchange occurred:

[Counsel for Defendant]: Do you recall opposing counsel showing you this, which is a toxicology report that showed at the time, the THC requires further analysis?

[Pease]: Yes. I recall that.

[Counsel for Defendant]: Okay. And does that mean anything to you? Does that mean you were high?

[Pease]: I was not high when I was working, and I'm not really sure, like, exactly when that would have been in my bloodstream in the current time.

[Counsel for Defendant]: Okay. So I want to scroll down where there is a confirmation.
Do you see these two numbers right, 245 and 23?

[Pease]: Yes.

[Counsel for Defendant]: Does that mean anything to you?

[Pease]: No, sir.

[Counsel for Defendant]: Okay. And to your knowledge, it doesn't mean you were intoxicated or anything, right?

[Pease]: I don't -- I was not intoxicated.

At another point in the trial, when Plaintiff's attorney examined Pease about what affects THC would have on Pease or his reaction time, Pease agreed he did not know because he infrequently smoked it, and he smoked it on "rare occasion." Defendant then objected because it "called for speculation," and the trial court overruled the objection.

On appeal, Appellant argues the trial court committed reversible error to admit a "hearsay drug report" and that the blood draw report showed residual THC "without the guidance of a medical expert" who can testify how the THC residual in the driver would have "any relevance in causing" the accident. The record reflects

30

that Appellant did not make these objections at trial. Plaintiff never objected at trial that the toxicology or "drug report" was unduly prejudicial under Rule 403. Nor was there any objection that it was irrelevant to proving proximate cause.[50] Moreover, Appellant's attorney questioned Pease about the toxicology report. Appellant failed to preserve error on that point.[51] And in its appellate briefing, Appellant failed to provide citation to legal authority or to the record in support of its argument, nor did Appellant provide any analysis about why the report may have been prejudicial, why it lacked probative value, or why it was hearsay.[52] By providing only bare assertions of error and unsupported allegations on this issue, we conclude Appellant's brief

---

[50] Appellant did argue in closing argument at trial that the Plaintiff had not offered an expert to testify about the meaning of the drug analysis results. Appellant made this argument after the report was admitted into evidence and after the close of evidence. To preserve error on the admission of evidence, an objection must be timely. *See* Tex. R. Evid. 103(a)(1)(A); *Schwartz v. Forest Pharms., Inc.*, 127 S.W.3d 118, 125 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

[51] *See* Tex. R. App. P. 33.1(a); *In re Commitment of Lopez*, 462 S.W.3d 106, 114 (Tex. App.—Beaumont 2015, pet. denied); *Wolhfahrt v. Holloway*, 172 S.W.3d 630, 639-40 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

[52] *See* Tex. R. App. P. 38.1(i) (an appellate brief must provide appropriate citations to legal authority and to the record); *In re S.P.*, No. 09-21-00296-CV, 2022 Tex. App. LEXIS 810, at *15 (Tex. App.—Beaumont Feb. 3, 2022, no pet.) (mem. op.) (explaining that an appellate brief must explain how the citations to legal authorities apply to the material facts in the record and support the appellant's arguments on appeal).

fails to satisfy Rule 38.1, Appellant has waived error on this issue.[53,54] That said, we presume that, in a bench trial, the trial court disregarded any improperly admitted evidence in making its judgment.[55] We overrule Appellant's third issue.

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 8, 2022
Opinion Delivered June 9, 2022

Before Golemon, C.J., Kreger and Johnson, JJ.

---

[53] We have previously explained that expert testimony is not required to show that a driver's use of drugs or alcohol caused a collision because causation may be proved by circumstantial evidence. *See Cravens*, 2021 Tex. App. LEXIS 677, at \*22 (citing *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex. 1992); *Ticknor v. Doolan*, No. 14-05-00520-CV, 2006 Tex. App. LEXIS 6717, at \*\*5-10 (Tex. App.—Houston [14th Dist.] July 27, 2006, pet. denied) (mem. op.)).

[54] *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) ("a point may be waived due to inadequate briefing[]"); *Kuykendall v. State*, 335 S.W.3d 429, 436 (Tex. App.—Beaumont 2011, pet. ref'd) (inadequate briefing waives error on appeal).

[55] *See Kmart Stores of Tex., LLC v. Ramirez*, 510 S.W.3d 559 (Tex. App.—El Paso 2016, pet. denied).